## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **HONORABLE TERRY PETTEWAY,** | § | |
| **HONORABLE DERRECK ROSE,** | § | |
| **HONORABLE MICHAEL ROSE,** | § | |
| **HONORABLE PENNY POPE,** | § | |
| **HONORABLE SONNY JAMES, and** | § | |
| **ROOSEVELT HENDERSON,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **VS.** | § | **Civil Action no. 3:13-cv-00308** |
| | § | |
| **GALVESTON, TEXAS; and** | § | |
| **THE HONORABLE MARK** | § | |
| **HENRY, in His capacity as** | § | |
| **Galveston County Judge** | § | |
| | § | |
| *Defendants.* | § | |

### DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants Galveston County and The Honorable Mark Henry, in his official capacity as Galveston County Judge, ("Defendants" or "Galveston County") Defendants hereby move the Court to dismiss the complaint and would show as follows:

### PRELIMINARY STATEMENT

This case arises from the Galveston County Commissioners Court exercise of its authority pursuant to the laws and Constitution of the State of Texas to redistrict and establish the precincts for election of Justices of the Peace and

1

Constables for Galveston County.

## FACTUAL BACKGROUND

According to the 2010 U.S. Census, Galveston County, Texas had a total population of 291,309 people.  The county had a total Black or African American population of 40,112, or 13.8% of the total population, and a total Hispanic or Latino population of 65,270, or 22.4% of the total population.  The Non-Hispanic White population of the county was 211,088, or 72.5% of the total population.

The most recent data from the American Community Survey – 2011 – showed a total citizen voting age (CVAP) population of 200,480 for Galveston County, Texas.  Of that total number the CVAP for the Black or African American population was 28,890, or 14.41% of the total CVAP, and the CVAP for the Hispanic or Latino population was 30,350, or 15.14% of the total CVAP. Combined, the CVAP for the Black or African American and Hispanic or Latino population was 59,240, or 29.55% of the total CVAP.

Prior to the August 2013 adoption of new districts, Galveston County had eight justice of the peace districts served by nine justices of the peace[1] and eight constables.  Of those eight justices of the peace districts, two had a combined African-American and Hispanic CVAP majority, precincts 2 and 3.  Each of these districts elected a minority justice of the peace, Plaintiffs Pope and James, and

---

[1] One of the justice of the peace districts – precinct 8 – had two places that were elected at-large from within the district.

minority constables, Plaintiffs Petteway and Rose.[2]  Plaintiff Montez was elected in a majority non-Hispanic white district.

The previous nine justices of the peace experienced varying degrees of caseload.  According to data published in the *Annual Statistical Report for the Texas Judiciary for Fiscal Year 2012* published by the Texas Office of Court Administration and the Galveston County budget proposals for fiscal year 2014 the following chart shows the average total caseload of each of the former justice of the peace courts:

| | |
|---|---|
| Precinct 1 | 8.13% |
| Precinct 2 | 2.10% |
| Precinct 3 | 7.60% |
| Precinct 4 | 17.71% |
| Precinct 5 | 16.51% |
| Precinct 6 | 7.18% |
| Precinct 7 | 19.31% |
| Precinct 8, Place 1 | 20.4% |
| Precinct 8, Place 2 | 1.73% |

Precincts 2 and 3 are the only majority minority districts in the previous election scheme and they constitute two of the three lowest caseload districts.

Beginning in 2011, the Galveston County Commissioners Court undertook

---

[2] Recent vote dilution theory has identified only two types of districts which are legally cognizable, a single race majority minority district, and a coalition of two or more minorities voting cohesively together so as to constitute a majority minority district.  Two other types of districts have been unsuccessfully suggested by Plaintiffs over the years: a "crossover" district where minorities make up less than a majority but are able to elect minority candidates with the assistance of majority race voters who "crossover", and "influence" districts in which minority race voters are incapable of electing candidates of choice that can influence the election of other candidates.  The Supreme Court "has held that § 2 does not require the creation of influence districts."  Nor does it require the creation of crossover districts.  *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) citing *LULAC v. Perry*, 548 U.S. 399, 445 (2006).  See also *Bartlett* at 13 n.4.

to redistrict the justice of the peace districts with the goal of reducing the number of justices of the peace to achieve financial savings and a balanced caseload. Specifically, Galveston County held five public hearings, a majority of which were attended by every current member of the Commissioners Court, about justice of the peace redistricting in different parts of the County.

In 2011 and, as mentioned previously, 2013, Galveston County collected and reviewed caseload and other operational data about its justice of the peace courts from the Texas Office of Court Administration.

Prior to August 2013, members of the Commissioners Court met individually with every sitting Galveston County Justice of the Peace, sometimes multiple times, to discuss the structure, staffing and general operations of each individual court.  Additionally, members of the Galveston County Commissioners Court met with the County's Justice Administration Department to discuss the operations of the justice of the peace courts and to review caseload data maintained by the department.

Finally, on August 16, 2013, Defendants caused to be posted a public notice of a special meeting of the Galveston County Commissioners Court to consider the adoption of new Justice of the Peace maps for Galveston County to be held on August 19, 2013.  Prior to the August 19, 2013 meeting, Defendants maintained eight Justice of the Peace Precincts which were served by nine Justices of the

4

Peace and eight Constables.

At the August 19, 2013 meeting of the Galveston County Commissioners Court, Defendants proposed a new map of Justice of the Peace Precincts which was drawn by a demographic expert, Thomas Hofeller, Ph.D., hired by legal counsel for Galveston County.  The new map essentially combined precincts 1, 2 and 3.  It also combined precincts 4 and 6.  The map then adjusted these two new districts with the remaining three precincts to make a total of four districts precincts in an effort to equalize caseload while at the same time maintaining and enhancing the ability of minority voters to elect candidates of their choice.

Public testimony from citizens of Galveston County was taken on the proposed maps and the County Commissioners Court discussed how a reduction in the number of the justice courts would best serve the interest of the people of the county and significantly reduce the cost of operating that court system while simultaneously freeing up resources to dedicate to other county administrative matters.  Additionally, members of Commissioners Court discussed whether the county would be best served by reducing the number of county courts to balance the caseload of the Justices of the Peace.

Following this testimony and deliberations by members of Commissioners Court, on August 19, 2013, by a vote of four to one Commissioners Court enacted the order, attached as Exhibit 1, which adopted the map complained of in this

5

litigation and thereby established new precinct boundaries for the election of justices of the peace and constables and abolished the offices of five Justices of the Peace and four Constable.

LEGAL ARGUMENTS AND AUTHORITIES

## I.     The Claims Cannot Withstand the Standard for Dismissal for Failure to State a Claim Under Fed R. Civ. P. 12(b)(6)

The court has authority to dismiss a suit for failure to state a claim upon which relief can be granted if the Complaint does not state factual allegations showing that the right to relief is plausible and above mere speculation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009); FED. R. CIV. P. 12(b)(6). In *Twombly*, the Supreme Court stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally

6

cognizable right of action"), on the assumption that all
the allegations in the complaint are true (even if doubtful
in fact), *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S.
506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) …

*Id.* at 1964 (footnote omitted).  As such, a complaint must "contain either direct

allegations on every material point necessary to sustain a recovery … or contain

allegations from which an inference fairly may be drawn that evidence on these

material points will be introduced at trial."  *See Loofbourrow v. Commissioner of*

*Internal Revenue Serv.*, 208 F. Supp. 2d 698, 709 (S.D. Tex. 2002) (quoting

*Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995)).  A plaintiff

must plead enough facts to state a claim that is plausible on its face.  *Reliable*

*Consultants, Inc. v. Earle,* 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American*

*Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir. 2007).  The plausibility standard

requires more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Legal conclusions are not "entitled to

the assumption of truth."  *Id.*

To avoid dismissal under Rule 12(b)(6), Plaintiff must plead specific facts,

not mere conclusory allegations.  *Loofbourrow*, 208 F. Supp. 2d at 708-709.  A

statement of facts that merely creates a suspicion that the Plaintiff might have a

cause of action is insufficient.  *Campbell*, 43 F.3d at 975.  This Court is "not

required to conjure up unpled allegations or construe elaborately arcane scripts to

save a complaint."  *Id.* (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st

Cir. 1988)).  Dismissal is appropriate if the live complaint lacks an allegation of an

essential element necessary to obtain relief.  *Campbell*, 43 F.3d at 975.

**II.    Claims should be Dismissed because the new redistricting plan provides proportional representation which give full effect to the appropriate strength of the minority voters in the County**

While the Voting Rights Act prohibits "any redistricting scheme which

*minimizes* or dilutes the voting strength of racial minorities,"[3] it does not require

proportional representation of minority population either. The Voting Rights Act

and its legislative history specifically disclaim any congressional intent to establish

any right to have members of a protected class elected in numbers equal to their

proportion in the population.[4]  Nor does the statute require that either legislatures

or courts impose a quota system for the election of minorities.  42 U.S.C. §1973(b).

But in analyzing this area, the Supreme Court has also recognized "an inherent

tension between what Congress wished to do and what it wished to avoid, because

any theory of vote dilution must necessarily rely to some extent on a measure of

minority voting strength that makes some reference to the proportion between the

minority group and the electorate at large." *Thornburg v. Gingles*, 478 U.S. 30, 84

(1986) (O'Connor, J., concurring).  Proportionality is not a *right* under §2, however

---

[3] Parker, Racial Gerrymandering and Legislative Reapportionment, MINORITY VOTE DILUTION 86 (C. Davidson, ed. 1984), citing Robert G. Dixon, Ir., DEMOCRATIC REPRESENTATION: REAPPORTIONMENT IN LAW AND POLITICS 460 (1968).

[4] "Nothing in this section [§2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  42 U.S.C. §1973(b)(1982); See *McGhee v. Granville County*, N.C., 860 F.2d 110, 117 (4th Cir. 1988).  This was an area of intense debate when the 1982 Amendments were passed and was added so that "it puts to rest any concerns that have been raised about racial quotas."  S. REP.  No.417, 97th Cong., 2d Sess.  (1982), *reprinted in* 1982 U.S. CODE CONG. & ADMIN. NEWS.

it can serve as a defense. *Johnson v. DeGrandy*, 512 U.S. 997, 1021 (1994). While the Supreme Court has refused to treat proportionality as absolute "safe harbor" for jurisdictions it does use proportionality as a critical factor in the analysis of what a "fair non-dilutive plan" would be so that it is a practical, if not a per se, "safe harbor."[5]  It should be noted that providing minority representation in excess of proportionality, even if that excess were generated by influence districts, would appear to be exactly the situation described in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144 (1977) as creating the type of situation which would allow majority race voters to assert a vote dilution claim under the 14th Amendment and arguably even under the Voting Rights Act.  This has caused other courts to note "a group that has electoral power, in the sense of power to elect the representatives of its choice, equal to its fraction of the electorate will be hard-pressed to demonstrate, and has not demonstrated in this case, that its members nevertheless have less opportunity than other members of the electorate to elect representatives of their choice." *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998) *cert. denied,* 524 U.S. 954 (1998).  Furthermore, we can find no court that has found a districting plan as dilutive under §2 where the jurisdiction provided proportional or very nearly proportional representation since

---

[5]  "It is enough to say that, while proportionality in the sense used here is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect candidates of their choice,'42 U.S.C. §1973(b) the degree of probative value assigned to proportionality may vary with other facts.  No single statistic provides courts with a shortcut to determine whether a set of single member districts unlawfully dilutes minority voting strength." *Johnson v. DeGrandy*, 512 U.S. 997, 1021 (1994).

the decision in *DeGrandy* which was further validated by Justice Kennedy's decision for the Court in *LULAC v. Perry*, 548 U.S. 399 (2006).[6]

It is quite clear in the Fifth Circuit that the frame of reference for assessing proportionality in a redistricting map is citizen voting age population (CVAP). The Fifth Circuit in *Campos* v. *City of Houston* 113 F.3d 544 (5th Cir. 1997), denied relief to Hispanics claiming vote dilution because "Houston's current electoral scheme has enabled its Hispanic community to elect city council members in greater than proportional numbers, based on its citizen voting age population. *Campos* at 548. The Fifth Circuit has also cited favorably in *Perez v. Pasadena Independent School District*, 165 F.3d 368, 372 (5th Cir. 1999), the Seventh Circuit case of *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998) *cert. denied,* 524 U.S. 954 (1998). "We think that citizen voting age population is the basis for determining the equality of voting power that best comports with the policy of [§2]." *Perez* at 372 quoting *Barnett* at 704.

The *Barnett* court is quite explicit in outlining the policy reasons why citizen voting age is the only logical frame of reference. The court accurately describes plaintiffs' argument when it states: "we should decide, therefore, before going any further, which population basis should be used in determining whether the

---

[6] In *LULAC* Justice Kennedy determined that the proper geographic frame of reference was: "We conclude the answer in these cases is to look at proportionality statewide." *LULAC* at 437. Which in this case would be the entire jurisdiction, i.e. Galveston County. Justice Kennedy also makes it clear that when examining proportionality issue he is using CVAP as his population basis: "[l]ooking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total, while Latinos make up 22% of Texas' citizen voting age population." *LULAC* at 438.

distribution of effective majority status is proportional to population.  The concept of virtual representation argues for using total population… it is assumed that citizen and noncitizen Latinos have a strong community of interest, then giving citizen Latinos extra voting power based on the number of noncitizen Latinos gives the latter a kind of representation in the political process… neither the census nor any other policy or practice suggests that Congress wants noncitizens to participate in the electoral system as fully as the concept of virtual representation would allow… [t]he right to vote is one of the badges of citizenship.  The dignity and very concept of citizenship are diluted if noncitizens are allowed to vote either directly or by the conferral of additional voting power on citizens believed to have a community of interest with the noncitizens…" *Barnett* at 704.  See also *Negron v. City of Miami Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.3d 1418, 1425-26 (9th Cir. 1989).

The combined Hispanic and African-American citizen voting age population in Galveston County is only 29.55%.  The previous justice of the peace and constable districting scheme had two districts which were majority minority, when the Hispanic and African-American citizen voting age population were combined.  Two districts is 25% of the eight districts and an even a smaller percentage of the nine justices of the peace.  These are both coalition districts.  For the purposes of this motion, Defendants will assume that the Hispanic and African-American

communities vote sufficiently cohesively so as to constitute a majority minority district.  However, Defendants do not concede for the purposes of this litigation that such cohesion and the nature of that cohesion has been proven.

Twenty five percent is only 4.55% less than the entire combined CVAP minority population in Galveston County.  In fact the math dictates that under any legal §2 or 14th amendment redistricting plan at most two districts out of either nine or eight would have been legally appropriate and that 25% of the districts would have constituted the full extent of legally required representation since no dilution of the minority vote could be taking place at that percentage.

Under the current four-district plan for Galveston County justice of the peace and constable districts, one district has a combined CVAP minority population which amounts to a majority within that district.  Plaintiffs have not disputed that this district is capable of electing the minority communities' candidate of choice.  One district out of four constitutes 25% of the representation in exactly the same manner that two districts out of eight constitutes 25%.  As set out above, the well-established precedent of the United States Supreme Court and the Fifth Circuit means that a districting plan for justices of the peace and constables which provides for a CVAP majority minority district that constitutes 25% of the total districts cannot be vote dilution under §2 or the 14th and 15th amendments.  This is true regardless of whether the redistricting plan contains

eight or four districts because there is no dilutive harm which can be alleged.  It is clear as a matter of law that the current four district plan provides the minority communities in Galveston County an equal opportunity with other voters in the county to elect candidates of their choice to the offices of justice of the peace and constable.  Plaintiffs' failure to allege properly a dilution claim is both understandable and a fatal defect under Rule 12(b)(6).  The complaint must be dismissed.

### III.    Plaintiffs have failed to allege facts that meet the first threshold *Gingles* prong.

While from the discussion above is clear that Plaintiffs can never state a claim for vote dilution on the facts of this case it is also clear that they cannot meet as a matter of law the first *Gingles* prong and have not pled facts sufficient to make out such a claim.  The basic elements of the §2 claim are described in *Thornburg v. Gingles,* 478 U.S. 30 (1986) where Justice Brennan, in a plurality opinion, writing for the Court,[7] noted that "[the] essence of a §2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986). Brennan then set out the "necessary preconditions" to prove that multimember

---

[7] 478 U.S. 30 (1986).  Four Justices, White, Marshall, Blackmun, and Stevens, concurred with Justice Brennan in the critical portion of his opinion (§IIB).

districts in various areas of North Carolina impair minority voters' ability to elect

representatives of their choice:

- First, the minority group must be able to demonstrate that it is *sufficiently large and geographically compact* to constitute a majority in a single-member district ….

- Second, the minority group must be able to show that it is *politically cohesive.…*

- Third, the minority must be able to demonstrate that the *white majority votes sufficiently as a bloc* to enable it--in the absence of special circumstances, such as the minority candidate running unopposed--usually to defeat the minority's preferred candidate. *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986).

- Finally, Justice Brennan noted that "the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." *Thornburg v. Gingles,* 478 U.S. 30, 51 (1986).

Justice O'Connor wrote an opinion, concurring in the judgment, which also

accepted the three-part test as a threshold requirement, which would only then

trigger an examination of the 'totalities of the circumstances' test.[8]  The application

of the three part test as threshold has been validated for both multi-member and

single-member districts in *Growe v. Emison*, 507 U.S. 25 (1993), and *Voinovich v.*

*Quilter*, 507 U.S. 146 (1993), making Justice O'Connor's opinion the real opinion

of the Court today.

　　　　What constitutes a district that is "*sufficiently large and geographically*

*compact* to constitute a majority in a single-member district" has been significantly

---

[8] *Gingles* at 83, O'Connor concurring.

14

refined by both the Fifth Circuit and the Supreme Court in the decades following

*Gingles.*  A series of Fifth Circuit cases -- *Campos v. City of Houston*, 113 F.3d

544 (5th Cir. 1997); *Valdespino v. Alamo Heights Independent School Dist.*, 168

F.3d 848 (5th Cir. 1999) cert. denied, 528 U.S. 1114 (2000); *Perez v.  Pasadena

Independent School District*, 165 F.3d 368 (5th Cir. 1999) contain clear statements

of the stringent requirements to challenge a redistricting plan.  To meet the first

*Gingles* threshold element a plaintiff must be able to prove that it can create an

additional compact citizen voting age (CVAP) majority minority district.  The

Supreme Court subsequently validated the position of the Fifth Circuit in *LULAC

v. Perry*, 548 U.S. 399 (2006) and *Bartlett v. Strickland*, 566 U.S. 1 (2009).[9]

Nowhere in Plaintiffs' complaint do they allege the existence of an

alternative redistricting map that provides an additional CVAP majority minority

district that will result in more appropriate representation for the minorities in

Galveston County without over representing those minorities.  Unless Plaintiffs

can meet the first *Gingles* prong, they cannot make out a cause of action.

*Voinovich v. Quilter*, 507 U.S. 146 (1993).  Plaintiffs failure to allege the existence

of an additional majority minority district means they have failed to meet the

---

[9] See also *Pender County v. Bartlett*, 361 N.C. 491, 510 (N.C. Sup. Ct. 2007), *aff'd sub nom*, *Bartlett v. Strickland*, 566 U.S. 1 (2009) "in order for a minority group to satisfy the first *Gingles* precondition and be 'sufficiently large and geographically compact to constitute a majority in a single member district' [internal cites omitted] it must constitute a numerical majority of citizens of voting age." *Reyes v. City of Farmers Branch, Texas*, 586 F.3d 1019 (5th Cir. 2009) (approving the CVAP standard for determining majority minority districts.

*Gingles* threshold requirement and thus failed to state a claim upon which relief may be granted.

## IV. Reducing the number of districts from nine and eight to four cannot be the basis for a cause of action.

Plaintiffs, at the most recent hearing, alluded to an issue which is not obvious from a plain reading of their complaint, that is, that reducing the total number of offices from nine and eight can constitute vote dilution under §2 of the Voting Rights Act or the 14th and 15th amendments of the Constitution. Justice Kennedy's opinion for the court in *Holder v. Hall*, 512 U.S. 874 (1994) would appear to foreclose such claim under the facts as pled of this case. The *Holder* case was a challenge to the single commissioner form of County government in the state of Georgia. Counties were not required use the single commissioner form of government, but it was allowed as one of the alternatives. Plaintiffs asserted that under a five district commissioner plan Plaintiffs could elect one of the commissioners in a majority minority district. Justice Kennedy quoting Justice O'Connor from her opinion in *Gingles* noted that in a vote dilution case there is a distinct problem because the phrase itself "'suggests a norm with respect to which the fact of dilution may be ascertained....[I]n order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system.'" *Holder* at 880-881,

16

quoting *Gingles* at 88.  Justice Kennedy then states, "the search for a benchmark is quite problematic when a §2 dilution challenge is being brought to the size of a government body.  There is no principled reason why one size should be picked over another as the benchmark for comparison." *Holder* at 881.

Justice Kennedy also made it very clear that the fact that a change in size of governmental bodies was a matter that would be subject to section 5 preclearance was of no aid to the Plaintiffs in this matter.  "[u]nlike in section 5 cases, therefore, a benchmark does not exist by definition in §2 dilution cases.  As explained above, with some voting practices, there in fact may be no appropriate benchmark to determine if an existing voting practice is diluted under § 2.  For that reason, a voting practice that is subject to the preclearance requirements of section 5 is not necessarily subject to a dilution challenge under § 2*." Holder* at 884.  Justice Kennedy closed by stating, "with respect to challenges to the size of a governing authority, respondents fail to explain where the search for reasonable alternative benchmarks should begin and end, and they provide no acceptable principles for deciding future cases.  The wide range of possibilities makes the choice 'inherently standardless'[internal citation omitted] and we therefore conclude that a plaintiff cannot maintain a §2 challenge to the size of a government body…" *Holder* at 885. The concerns regarding the "standardless" nature of challenging the size of a body are equally applicable if brought on a constitutional claim and would appear

equally applicable.  In short any claim challenging the decision to draw four justices of peace and constable districts, particularly where the percentage of majority minority districts is maintained, must be dismissed as a matter of law.

### V.    Influence claims are not cognizable.

Plaintiffs' Counts One and Two both make claims that Plaintiffs' harm is a denial of "an equal opportunity to participate effectively in the political process and to have any meaningful or significant influence in elections for the offices of Justice of the peace… [and] Constable in Galveston County."  Original Complaint at ¶¶ 58-62.  While it is not clear at all from the complaint how Plaintiffs believe that they are denied influence by the new justice of peace and constable districts it is quite clear that after *Bartlett v. Strickland*, 566 U.S. 1 (2009) and *LULAC v. Perry*, 548 U.S. 399 (2006), influence claims are not cognizable as a matter of law under §2 of the Voting Rights Act.  Justice Kennedy was quite forceful in his opinion in *Bartlett* that the types of claims suggested by the Plaintiffs in count one and two are not legally cognizable under the facts alleged in this complaint.  In *Bartlett* Justice Kennedy (citing to his own opinion in *LULAC*) stated:

> "if section 2 were interpreted to require crossover districts throughout the nation,' it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions.'[Internal citations omitted] *Bartlett* at 21.  [Justice Kennedy continued] "[under] petitioner's view of the case courts and legislatures would need to scrutinize every factor that

18

enters into districting to gauge its effect on crossover voting injecting this racial measure into the nationwide districting process would be of particular concern with respect to consideration of party at registration or party influence. The easiest and most likely alliance for a group of minority voters is one with a political party, and some have suggested using minority voters' strength within a particular party as a proper yardstick under the first *Gingles* requirement….That approach would replace an objective, administrable rule with a difficult 'judicial inquiry into party rules and local politics'… more troubling still is the inquiry's fusion of race and party affiliation as a determinant when partisan considerations themselves may be some suspect in the drawing of district lines….And thus with the relationship between race and party further distort and frustrate the search for neutral factors and principled rationales for districting." *Bartlett* at 22-23 [internal citations omitted].

While the decision in *Bartlett* has eliminated influence claims under §2 of the Voting Rights Act because they cannot meet the first prong of the *Gingles* test, *Voinovich v. Quilter,* 507 U.S. 146 (1993), which was decided before *Bartlett*, clearly illustrates that any influence claim under the facts pled in this case would also fail to meet the second and third *Gingles* prongs as a matter of law. The Democrat Plaintiffs claimed that "the plan [drawn by Republicans] packed black voters by creating districts in which they would constitute a disproportionately large majority," thereby violating §2 of the Voting Rights Act and the 15th amendment. In the Democrats' view, "the plan should have created a larger number of influence districts -- districts in which black voters would not constitute

a majority but in which they could, with the help of a predictable number of crossover votes from white voters, elect their candidates of choice [i.e. NHW Democrats]."[10]  The District Court found for the NHW Democrat plaintiffs; however the Supreme Court in a unanimous opinion reversed.

In *Voinovich*, the Court refused to decide "whether influence dilution claims such as appellees' are viable under § 2"[11]  (that would occur later in *Bartlett*). The court noted that this case did not involve the usual vote dilution claims of "fragmentation of a minority group" (cracking) or that "Ohio's creation of majority black districts prevented black voters from constituting a majority in additional districts." (packing)[12]  However, the Court did say that while the "first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single member district, would have to be modified," the other two preconditions would definitely apply if an influence claim were actionable.[13]  The Court then noted that it was necessary for the plaintiffs' argument to assert "coalitional voting between whites and blacks" and that black interests could be adequately represented from "districts with only a 35% black population."[14]  The Court used these factual concessions to find that plaintiffs failed to prove the

---

[10] *Id* at 149-150.
[11] *Id* at 154.
[12] *Id* at 153.
[13] *Id* at 158.
[14] *Id* at 151-152.  The choice of 35 percent is significant because it is in the range of the quota of black vote typically needed to draw a safe white Democrat district.

polarized voting requirements of the *Gingles* preconditions.[15] The *Voinovich*

holding creates a "Catch-22" for Plaintiffs attempting to allege an influence claim;

the mere fact that polarized voting is supposedly low enough to allow for effective

influence means that the polarized voting is not sufficiently great so as to create a

legally cognizable harm particularly under §2 of the Voting Rights Act.

While the decision in Bartlett specifically reserved the question of whether

intentional discrimination could allow for influence districts it is hard to imagine

how the concerns raised by Justice Kennedy in the quotation above are any less

applicable in the constitutional context than they are in the statutory.  Furthermore

it would appear that even under a constitutional claim the logic of the *Voinovich*

case would foreclose there being a sufficient discriminatory effect that would allow

the claim to proceed even if there were proof of invidious discriminatory intent.

Therefore under the facts pled in this case any claim citing to a loss of influence as

a harm, particularly when proportional representation has been provided, should be

dismissed as a matter of law.

## VI.    Racial Gerrymandering claim is inconsistent with the facts pled by Plaintiffs.

Finally there is the question of count three.  Count three is what is

commonly referred to as a *Shaw v. Reno*, 509 U.S. 630 (1993), claim which seems

completely inconsistent with the first two claims in plaintiff's complaint.  It is not

---

[15] *Id* at 158.

asserted in the alternative, nor is it explained elsewhere in the compliant.  Plaintiffs

asserting racial gerrymandering claims are normally attempting to eliminate as

unconstitutional majority minority districts which have been drawn in conformance

with the demands of the Department of Justice in preclearance actions.  The claim

has as its basis that a defendant has allowed consideration of race to "predominate"

over neutral state criteria.

Courts and legislatures were in a difficult position after *Shaw;* they still had

to contend with the continuing validity as stated by the *Shaw* Court of §§2 and 5 of

the Voting Rights Act, and racial vote dilution under the Fourteenth Amendment

but not to the level where race "predominated".  A majority of the Justices for

vastly different and mutually incompatible reasons viewed the *Shaw* line of cases,

the Voting Rights Act and racial vote dilution under the Fourteenth Amendment to

be antithetical and irreconcilable.[16]  Justice O'Connor, the deciding vote in all of

the *Shaw* cases, had disagreed beginning with *Shaw I.*[17]  She asserted that these are

not antithetical concepts and in her opinion and concurrence in *Bush v. Vera*, 517

U.S. 952 (1996), she created a more workable unifying hierarchy which she

---

[16] *Bush v. Vera*, 517 U.S. 952 (1996) Justice Kennedy concurring; Justice Thomas, joined by Justice Scalia, concurring in the judgment; Justice Stevens, joined by joined by Justices Ginsberg and Breyer, dissenting; Justice Souter, joined by Justices Ginsberg and Breyer, dissenting.  See also supra n. 118.

[17] "This Court never has held that race-conscious state decision-making is impermissible in all circumstances. *Shaw I* at 642.  " [C]ompliance with the results test of §2 of the Voting Rights Act (VRA) is a compelling state interest. Second; that test can coexist in principle and practice with *Shaw* [cite omitted] and its progeny."  517 U.S. 990 (O'Connor concurring).  "Although I agree with the dissenters about § 2's role as part of our national commitment to racial equality, I differ from them in my belief that that commitment can and must be reconciled with the complementary commitment of our Fourteenth Amendment jurisprudence to eliminate the unjustified use of racial stereotypes."  517 U.S. at 993.  See also 515 U.S. at 928, supra at n. 123.

referred to as a "framework" similar to that used in the deviation cases.[18] This framework for analyzing *Shaw* cases is still the definitive statement of the Supreme Court.

Justice O' Connor would allow race to be considered and majority-minority districts to be intentionally drawn so long as these districts did not violate the state's redistricting criteria without invoking strict scrutiny. *Bush v. Vera*, 517 U.S. 952 (1996). Justice O'Connor makes this point throughout her opinion by emphasizing "for strict scrutiny to apply, the Plaintiffs must prove that other, legitimate districting principles were 'subordinated' to race." *Id.* at 959. She goes on to elevate the violation of the states' traditional districting criteria to a threshold issue. In part II of the decision, Justice O'Connor states "the neglect of traditional districting criteria is merely necessary, not sufficient. For strict scrutiny to apply, traditional districting criteria must be subordinated to race. [Cite omitted] Nor, as we have emphasized, is the decision to create a majority minority district objectionable in and of itself." *Id.* at 962. Likewise, Justice O'Connor notes that states "may avoid strict scrutiny altogether by respecting **their own** traditional districting principles…and nothing we say today should be read as 'limiting a

---

[18] Justice O'Connor, describing her reasons for writing a separate concurrence after having delivered the opinion of the Court in *Bush*, explained that she believed "States and lower courts are entitled to more definite guidance as they toil with the twin demands of the Fourteenth Amendment and the VRA...In addition, fundamental concerns of federalism mandate that states be given some leeway so that they are not 'trapped between the competing hazards of liability'." 517 U.S. at 990-992, Quoting *Wygrant v. Bd. of Ed.*, 476 U.S. 267, 291 (1986) (O'Connor concurring). "Today's decisions, in conjunction with the recognition of the compelling state interest in compliance with the reasonably perceived requirements of §2, present a workable framework for the achievement of these twin goals." *Id* at 993.

state's discretion to apply traditional districting principles,'[cite omitted] in majority-minority, as in other districts." *Id* at 978 (emphasis added). She repeats this point in her concurrence when she says "states may intentionally create majority minority districts, and may otherwise take race into consideration without coming under strict scrutiny… so long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy." *Id.* at 993. Violations of the state's criteria could be justified if it can be shown that the state has "a strong basis in evidence" that the *Gingles* factors are present.[19]

Under O'Connor's framework, in order for Plaintiffs to state a claim for racial gerrymandering, they have to allege that the traditional redistricting criteria for justices of the peace and constable districts were not followed by Galveston County in the construction of the current districting plan. Plaintiffs' complaint alleges no map, nor data which might substantiate this claim. In fact the only map which plaintiff puts forward is the current eight district map which contains a grossly racially gerrymandered district in old precinct 2, which constitutes less than 3% of the county's total caseload and a miniscule portion of the county's population and only appears to exist in order to create a position for a minority justice of the peace and constable. The only way that Plaintiffs can justify such a district in their map is by asserting that it is required in order to avoid vote dilution

---

[19] *Id* at 994. Justice O'Connor would find that a violation of §2 of the Voting Rights Act (and presumably the Fourteenth Amendment) would constitute "a compelling state interest" sufficient to meet strict scrutiny which could be remedied by a race-based method if narrowly tailored. *Id.* at 990.

under §2 or the 14th amendment.  As is well illustrated by Justice O'Connor's framework, such a position by Plaintiffs destroys their assertion that race predominated in the current justice of peace and constable districts and would allow the county to draw majority minority districts which violated the traditional redistricting criteria such as those alluded to by the North Carolina supreme court in *Pender County v. Bartlett*, 361 N.C. 491, 510 (N.C. Sup. Ct. 2007) *aff'd sub nom*, *Bartlett v. Strickland*, 566 U.S. 1 (2009).  Furthermore, if Plaintiffs are actually successful on this count, the County could actually eliminate all of the majority minority justice and peace and constable precincts.  This would appear to be contrary to what Plaintiffs are seeking in this litigation since, with one exception, they are in fact the current officeholders.

CONCLUSION

**WHEREFORE** Defendants pray the Court enter judgment that Plaintiffs' allegations against Defendants be dismissed because the complaint fails to state a claim against defendant upon which relief can be granted, or in the alternative, that Plaintiff be required to replead to provide a factual basis for each of their claims.

Respectfully submitted,

GALVESTON COUNTY LEGAL DEPARTMENT

/s/ Robert Boemer
Robert B. Boemer – Attorney In Charge
State Bar No.: 02550550

Barry C. Willey
State Bar No.: 00788670
722 Moody, 5th Floor
Galveston, Texas 77550
Telephone: (409) 770-5562
Facsimile: (409) 770-5560


**BEIRNE, MAYNARD & PARSONS, L.L.P.**

James E. "Trey" Trainor, III
State Bar No.: 24042052
Dalton L. Oldhan (pro hoc vica filed)
401 W. 15th Street, Suite 845
Austin, Texas 78701
Telephone: (512) 623-6700
Facsimile: (512) 623-6701

Joseph M. Nixon
State Bar No.: 15244800
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Telephone: (713) 871-6809
Facsimile: (713) 960-1527

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2013 that I electronically filed the foregoing document with the Clerk of the United States District Court for the Southern District of Texas, Galveston Division, using the electronic case filing system of the Court. The electronic case filing systems sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Chad W. Dunn
K. Scott Brazil
BRAZIL & DUNN
4201 FM 1960 West, Suite 530
Houston, Texas 77068

Neil G. Baron
LAW OFFICE OF NEIL G. BARON
914 FM 517 West, Suite 242
Dickinson, Texas 77539

**ATTORNEYS FOR PLAINTIFFS**


_____/s/ Robert Boemer_____
Robert B. Boemer