IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| HONORABLE TERRY PETTEWAY, | § | |
| HONORABLE DERRECK ROSE, | § | |
| HONORABLE MICHAEL MONTEZ, | § | |
| HONORABLE PENNY POPE, | § | |
| HONORABLE SONNY JAMES, and | § | |
| ROOSEVELT HENDERSON, | § | |
| | § | CIVIL ACTION NO. |
| Plaintiffs, | § | 3:13-CV-00308 |
| | § | |
| v. | § | |
| | § | |
| GALVESTON COUNTY, TEXAS and | § | |
| HONORABLE MARK HENRY, | § | |
| in his capacity as Galveston County Judge, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' POST TRIAL BRIEF**

i

TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES ....................................................................... ii

I.    Standing ................................................................................................1

        A.    Residents of the County's Newly-Created Precinct 3
              Who Live on Galveston Island: Penny Pope
              And Terry Petteway.................................................................3

        B.    Residents of the County's Newly-Created Precinct 3
              Who Do Not Live on Galveston Island: Sonny James,
              Derreck Rose and Roosevelt Henderson.................................7

        C.    Residents Outside the County's Newly-Creating Precinct
              Mike Montez .............................................................................8

        D.    Voting Rights Cases That Support the Proposition
              That Plaintiffs Have Standing ...............................................11

II.   Crossover/Coalition Districts ..........................................................14

III.  Intent Factors ....................................................................................18

IV.   Proportionality ..................................................................................29

V.    Conclusion .........................................................................................37

CERTIFICATE OF SERVICE...........................................................................38

# TABLE OF AUTHORITIES

**Cases** **Page**

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)..................................................................................14, 15, 17

*Brown v. Bd. of Educ.,*
    347 U.S. 483 (1954).........................................................................22

*Columbus Bd. of Educ. v. Penick,*
    443 U.S. 449 (1979).........................................................................33

*Connecticut v. Teal,*
    457 U.S. 440 (1982).........................................................................32

*Dept. of Commerce v. U.S. House of Representatives,*
    525 U.S. 316 (1999)..........................................................................8

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
    438 U.S. 59 (1978)............................................................................2

*Fairley v. Patterson,*
    493 F.2d 598 (5th Cir. 1974) ........................................................12

*Gen. Contractors v. Jacksonville,*
    508 U.S. 656 (1993).........................................................................14

*Hall v. Virginia,*
    385 F.3d 421 (4th Cir. 2004) ........................................................11

*Hoskins v. Hanna,*
    8 F.3d 21 (5th Cir. 1993) ..............................................................19

*Hunter v. Underwood,*
    471 U.S. 222 (1985).........................................................................35

**Cases**                                                                   **Page**

*Johnson v. De Grandy,*
    512 U.S. 997 (1994)...................................................................29

*Kostick v. Nago,*
    2013 WL 3487694 (D. Haw. July 11, 2013) ................................14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).....................................................................2

*LULAC v. Clements,*
    999 F.2d 831 (5th Cir. 1993) ......................................................16

*LULAC v. Perry*,
    548 U.S. 399 (2006)............................................................*passim*

*Public Citizen, Inc. v. Bomer,*
    274 F.3d 212 (5th Cir. 2001) .......................................................2

*Rogers v. Lodge*,
    458 U.S. 613 (1982)...........................................................*passim*

*Shaw v. Hunt,*
    517 U.S. 899 (1996)....................................................................31

*Shaw v. Reno*,
    509 U.S. 630 (1993)....................................................................13

*Shelby County, Ala. v. Holder,*
    133 S. Ct 2612 (2013).........................................................*passim*

*Swann v. Bd. of Educ.*,
    402 U.S. 1 (1971).......................................................................33

*Texas Democratic Party v. Benkiser,*
    459 F.3d 582 (5th Cir. 2006) ........................................................5

**Cases**                                                           **Page**

*Texas v. U.S.*,
   Cause No. 1:11-cv-01303-RMC-TBG-BAH,
   Mem. Op. (ECF No. 115), Dec. 22, 2011
   ("D.C. Summary Judgment Op.") ...................................................15

*Thornburg v. Gingles,*
   478 U.S. 30 (1986)....................................................................31

*U.S. v. Hays*,
   515 U.S. 737 (1995)..................................................................13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ......................................................20, 34, 36

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................2

*Wright v. Dougherty County, Ga.*,
   358 F.3d 1352 (11th Cir. 2004) ...............................................12

*White v. Regester*,
   412 U.S. 755 (1973) ..................................................................35

**Statutes & Public Law**

42 U.S.C. §§1973 ..............................................................*passim*

HELP AMERICA VOTE ACT (PUB.L. 107-252).......................................22

U.S. CONST. amend. XIV ........................................................15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| HONORABLE TERRY PETTEWAY, | § | |
| HONORABLE DERRECK ROSE, | § | |
| HONORABLE MICHAEL MONTEZ, | § | |
| HONORABLE PENNY POPE, | § | |
| HONORABLE SONNY JAMES, and | § | |
| ROOSEVELT HENDERSON, | § | |
| | § | CIVIL ACTION NO. |
| Plaintiffs, | § | 3:13-CV-00308 |
| | § | |
| v. | § | |
| | § | |
| GALVESTON COUNTY, TEXAS and | § | |
| HONORABLE MARK HENRY, | § | |
| in his capacity as Galveston County Judge, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' POST TRIAL BRIEF

Plaintiffs submit this post trial brief pursuant to the Court's Order on January 17, 2014.

## I.     STANDING

Plaintiffs contend that Plaintiffs who reside in the newly-created majority-minority precinct and Plaintiff Montez, who resides outside of the newly-created majority-minority district, have standing to assert the claims set forth in the

1

complaint because their voting strength is being intentionally diluted and in support, offer the Court the following.

Generally, to comply with the minimum standing requirements of Article III, Plaintiffs must establish "an injury in fact" to a legally-protected interest, and that injury must be both: (a) "concrete and particularized and (b) actual or imminent[, and] not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Plaintiffs must also establish the injury is "'fairly traceable' to the defendant's actions; and the injury will 'likely . . . be redressed by a favorable decision." *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) quoting *Lujan*, 504 U.S. at 560-61.

Additionally, the Supreme Court has held that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement . . . the plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The purpose of this additional requirement is to avoid "the adjudication of rights which those not before the Court may not wish to assert" and to make certain "the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Envtl. Study Grp, Inc.*, 438 U.S. 59, 80 (1978). The Plaintiffs in this case can be easily divided into three categories

that make them the most effective advocates for the rights at issue.  Each of these

categories is discussed below.

### A. Residents of the County's Newly-Created Precinct 3 Who Live on Galveston Island: Penny Pope and Terry Petteway

The Court will no doubt recall the evidence demonstrates, and such evidence

is uncontested, minority citizens in Galveston County had the ability to elect or

influence the election of candidates in previous districts 1, 2, 3 and 5.  Districts 1

and 5 were coalition districts, while the parties agree districts 2 and 3 were

majority-minority opportunity districts.  Thus, under the benchmark map, Plaintiffs

had the opportunity to elect four of eight Justices of the Peace/Constables in

Galveston County.  Districts 1 and 2 were centered on Galveston Island, while

Districts 3 and 5 were on the mainland, non-Bolivar, portion of the County.  Under

the challenged plan, only four districts exist, and the minority population in the

County has been consolidated into one new District 3, which includes portions of

the minority population of Galveston Island and the mainland, and the Bolivar

Peninsula. Thus, minority voters controlled four districts under the benchmark

arrangement and have the ability to elect only one under the proposed regime.

Returning to standing, in this case, the Plaintiff elected officials residing in

the newly-created minority-majority district have provided proof in support of their

standing to assert a vote dilution claim.  They have all testified they are African

3

American and are potential candidates for the offices of Justice of the Peace or Constable in the newly-created Precinct 3.  They have further testified that, prior to the adoption of the new plan, they had served as elected officials—either as Justices of the Peace (Pope and James) or as Constables (Petteway and Rose). They held these positions in former Precincts 2 and 3, which were majority-minority precincts under the former plan.  They have all testified in deposition and/or at trial that they are now paired with at least two other incumbents in the newly-created Precinct 3, which is the only majority-minority precinct under the new plan, and that the pairing will injure them by damaging their ability to qualify for a runoff election and to ultimately prevail in the primary election for their party nomination.  Additionally, the new plan has destroyed the chances of victory for at least two (and possibly more) of the four incumbent Plaintiffs residing in the newly-created District 3 because the new plan packs at least three incumbents for each office into a single precinct.

Furthermore, each Plaintiff elected official residing in the new Precinct 3 has testified in deposition and/or at trial that the newly-created majority-minority precinct combines several minority communities from the Mainland and the Island with the Bolivar Peninsula.  They have all testified the creation of the new precinct will impose additional burdens on them as candidates and voters and require them

4

to spend additional money and time to campaign in minority areas that are not communities of interest and to campaign in the Bolivar Peninsula. *See, e.g., Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006). They have also testified that whoever is ultimately elected to the offices of Justice of the Peace or Constable in the new District 3 will be required to serve three separate communities located on the Mainland, Galveston Island, and the Bolivar Peninsula. This will not be required of any other office holder under the new plan.

However, even if the harm they suffer as elected officials is ignored, each member of this category of Plaintiffs has provided evidence of the harm s/he will suffer as eligible, registered minority voters in Galveston County who reside in the now packed Precinct 3. Each of the Plaintiff elected officials, as well as Plaintiff Roosevelt Henderson, has provided evidence of the personal injuries s/he will suffer as eligible and registered minority voters in Galveston County who now reside in a packed district 3. They have testified the pairing of minority incumbents in the newly-created District 3 will dilute their ability to elect candidates of their choice. Indeed, the new plan could actually result in the election of a candidate who is not the minority community's candidate of choice because the minority community's vote potentially will be split among the several incumbents who are paired in the new Precinct 3. Rapidly growing population on

5

Bolivar, one of the reasons given by the DOJ when it objected to a similar plan, the evidence demonstrates, is likely to continually diminish minority voting power in the new Precinct 3.  These Plaintiffs also have testified the new plan is likely to result in the election of a person who lives on the mainland, rather than on Galveston Island.  Therefore, Plaintiffs Penny Pope, Sonny James, Derrick Rose, Roosevelt Henderson and Terry Petteway, have shown a particularized harm in so far as they will likely lose representation and attention from the officeholder that the evidence demonstrates are some of the closest and most important to the community.

It is undisputed that the newly-adopted plan will result in a further reduction of minority elected officials in Galveston County.  Prior to the adoption of the new plan, there were a total of seven minority elected officials in Galveston County, including Judge Slaughter, a Republican District Judge, elected in November 2012. Following the adoption of the new plan, there will be at least three fewer minority elected officials in Galveston County because of the pairing of minority incumbents under the new plan.  The aforementioned testimony establishes the five Plaintiffs residing in the new plan's majority-minority district have standing to assert a vote dilution claim.

**B.** **Residents of the County's Newly-Created Precinct 3 Who Do Not Live on Galveston Island: Sonny James, Derreck Rose and Roosevelt Henderson**

The Plaintiffs who reside in the newly-created Precinct 3 and live on the mainland also have provided evidence of the harm they suffer.  Though this harm may seem less than the other Plaintiffs, because the evidence demonstrates the minority voters on the mainland are likely to control the outcome of the newly-created District 3, the new plan has nevertheless diluted these Plaintiffs' voters.  Under the benchmark plan, minorities who lived on the Mainland portion of the County had the ability to elect and/or influence the outcome of the election in Districts 3 and 5.  Now, they only will have the ability to influence the outcome of the election in District 3, which they will share with the minority community on Galveston Island and the Anglo community on Bolivar.

This discriminatory or retrogressive effect is a useful starting point in assessing the issue of racially discriminatory intent.  As discussed below, the County admits it intentionally dismantled, and gave no consideration to, Districts 1 and 5 under the benchmark plan when it adopted the newly-adopted plan.  Because of this and other overwhelming evidence of intentional discrimination, the Plaintiffs in this category have clearly suffered harms, albeit different harms than those suffered by other categories of Plaintiffs.  Their voting strength has been

7

diluted because they lose one officeholder and now must share the one they gain with the other county residents, including the other major concentration of the minority population in the County and the rapidly growing Anglo population on Bolivar.

### C.   Residents Outside the County's Newly-Created Precinct: Mike Montez

The Plaintiff who resides outside the newly created majority-minority district, Mike Montez, has also established an injury in fact, which is traceable to the County's adoption of the new plan and can be redressed by a Court order enjoining that plan.[1]  Defendants have no argument to defeat Montez's standing because he has the quintessential harms of a voting rights Plaintiff.  Plaintiff Montez is a minority voter and officeholder. He has testified the new plan places him in a precinct where he will not be able to prevail as a candidate and also will not be able to vote for his and the minority community's candidate of choice.  In order for Montez to compete for the office of Constable, he will have to prevail against a paired Anglo incumbent in a precinct drawn to benefit non-Hispanic whites.   Furthermore, Montez is now required to run for an election in a district containing more than 80,000 residents, while other members of the minority

---

[1] Standing for one Plaintiff is sufficient.  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999).

community residing in the majority-minority precinct will only be required to run for election in a district containing approximately 38,000 residents.

Plaintiff Montez also suffers harm as a voter.  Prior to the adoption of the new plan, Constable Montez resided in Precinct 5, which had consistently elected candidates of the minority community's choice.  That precinct has been split apart by the new plan.  A portion of that precinct has been placed in the new majority–minority precinct, but the portion of the precinct in which Constable Montez resides has been placed in a precinct which has a population that is more than 60 percent non-Hispanic white.  Consequently, Constable Montez has lost his ability to elect a preferred candidate of choice with other minority voters and will no longer have the ability to vote for a candidate of the minority community's choice in what is now Precinct 1.

In fact, Constable Montez specifically testified, "I feel that the way the new maps are drawn they will be putting all the minorities in one precinct.  And it looks like for a minority to try to win they would have to move to that precinct.  I know that a Latino ran against a non-Latino or Anglo in Precinct 8 and he lost.  So he didn't stand a chance winning up there now.  So I think if we change these numbers now it is going to be even worse."  Montez deposition, p. 26, 18-25.  Constable Montez further testified that he objected to the new plan because "it

doesn't give the minorities a chance. All you are going to have is one minority precinct. So that means that the minority will only be able to win in one precinct. It doesn't give them any other chance to win in any other precincts throughout the County." Montez deposition, p. 36, 7-21.

Constable Montez's testimony clearly establishes he has been redistricted from a precinct where he successfully ran for, and was elected to, political office as the minority voters' candidate of choice. Constable Montez, as a voter, also had the ability to influence the outcome of the election in the old Precinct 5 but now has no influence in the new Precinct 3. Plaintiff Montez is one of the many Latinos in Galveston County who have been stranded in Anglo majority districts. In fact, Plaintiff Montez is one of the 84 percent of Latinos in Galveston County who have been placed into Anglo majority districts, where they will have no impact whatsoever on the outcomes of elections and where the evidence demonstrated the Anglo-elected candidates will be less responsive to the needs of the minority community. Dr. Barreto and Dr. Pedraza's Report (Plt. Ex. 1, p. 9) provides evidence that Galveston County's new plan leaves most of the minority population in the County in districts where they will have no influence on the outcome of the election:

| **Percent Who Reside in Majority-Minority District** | **Percent Who Reside in Majority Anglo District** |
|---|---|
| Latinos: 16 percent (10,415/65,270) | Latinos: 84 percent (54,855/65,270) |
| Blacks: 40 percent (16,839/42,280) | Blacks: 60 percent (25,411/42,280) |
| Anglos: 6 percent (10,880/172,652) | Anglos: 94 percent (161,772/172,652) |

Given that there was no reason to substantially under-populate the minority district, even assuming the Defendants' case count argument is entitled to some merit, the only basis for under-populating the minority district was to *intentionally* strand as many minority citizens as possible into districts where they would have no voice and be powerless to elect their preferred candidate.

Though all Plaintiffs can demonstrate standing, Plaintiff Montez alone is sufficient to present this Court with a case and controversy requiring adjudication.

### D.   Voting Rights Cases That Support the Proposition That Plaintiffs' Have Standing

Defendants' argument on standing is that because they have packed all the Plaintiffs (except Montez) into the new minority district, none can now complain. This is incorrect.  Putting aside the fact that the Court need not reach the standing of the Plaintiffs other than Constable Montez,[2]  the authorities clearly establish the remaining Plaintiffs have standing to challenge the new plan.

---

[2] Defendants still cannot explain away Montez's standing and therefore the case should continue, even if only under him alone.  *See Hall v. Virginia*, 385 F.3d 421, 427 n.10 (4th Cir. 2004) (declining to analyze the standing of other Plaintiffs in a Voting Rights Act case in light of some Plaintiffs "unquestionably" having standing).

Where, as here, minority voters who previously have elected candidates of choice are now intentionally packed into one district to diminish their opportunity to elect candidates of choice, minority voters are clearly harmed. Defendants' argument that residents within a performing minority district cannot challenge a plan because they "benefit" from it is not only false but derives from cases addressing malapportionment. *See, e.g.*, *Wright v. Dougherty Cnty., Ga.*, 358 F.3d 1352 (11th Cir. 2004). The reason for such a rule in those one-person, one-vote cases is that "the citizens' injury results only to those persons domiciled in the under-represented voting districts." *Id.* (quoting *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974)). The doctrine makes sense mathematically in malapportionment cases, but this is not a malapportionment case. The law is clear that a 10 percent or less population deviation is not required for these offices. Plaintiffs complain about the unbalanced apportionment of population only because it shows the Defendants' intent to strand a majority of the minority population in Galveston in districts where they will have no electoral voice. Though this may read as only a standing argument in defense of Plaintiff Montez, the remaining Plaintiffs who will reside in the new Precinct 3 are also victims of intentional voting discrimination because they suffered a dramatic diminution of their voting strength.

12

The manner and method by which their communities of disparate interests have been combined into one district, for the purpose of diluting the minority vote, has caused the other Plaintiffs harm as well.  Stated another way, the Plaintiffs other than Montez have lost the ability to elect candidates of choice or to participate effectively in the political process in four districts and eight officeholders, and they now can elect only two candidates of choice.  While the County has attempted to justify this outcome on legitimate government interests, the weight of the intentional discrimination evidence demonstrates all the Plaintiffs have suffered harm as a result of the inappropriate motive of discriminatory intent.  Because of this, standing in this case should be analyzed under cases dealing with racial gerrymanders.  *See e.g.*, *United States v. Hays*, 515 U.S. 737, 744 (1995).  In those cases, the Supreme Court has recognized that drawing districts with discriminatory intent causes injury because "[w]hen a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole."  *Id.* (quoting *Shaw v. Reno*, 509 U.S. 630, 648 (1993)).  Additionally, "[w]here a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has

standing to challenge the legislature's action." *Id.* (citing *General Contractors v. Jacksonville*, 508 U.S. 656 (1993)).

Lastly, this case has similarities to the recently issued opinion in *Kostick v. Nago*, 2013 WL 3487694 (D. Haw. July 11, 2013) (three-judge court) (finding Plaintiffs had standing when their "usual residence" in a district was moved into another district, thereby resulting in the loss of ability to elect to a Senate seat).

All the Plaintiffs have therefore proven they each would suffer an individualized harm, especially as a result of the intentionally discriminatory acts of Galveston County, and they therefore have standing.  It is worth noting that when a local government acts with a racially discriminatory intent, it does not pick out the individual voters it seeks to harm.  Rather, it seeks to discriminate against the group of voters to which these Plaintiffs belong.  That is precisely what happened here.

## II.    CROSSOVER/COALITION DISTRICTS

The Supreme Court has been careful to distinguish between crossover and coalition districts.  In *Bartlett v. Stickland*, 556 U.S. 1 (2009), in speaking of crossover districts,[3] the Court held that, while Section 2 does not compel their *creation* by the legislature, 551 U.S. at 13-16, if a state "intentionally drew district lines in order to *destroy* an otherwise effective crossover" district, that

---

[3] *Bartlett* did not directly address coalition districts. 551 U.S. at 13-14.

action would be constitutionally suspect under the Fourteenth Amendment, *id*. at 24 (emphasis added).  In other words, refusing to create crossover districts is one thing under Section 2; deliberately dismantling them is quite another under the Fourteenth Amendment and the Voting Rights Act.

The Supreme Court has also been careful to note the heightened protection to be afforded coalition districts.  For example, in *LULAC v. Perry*, 548 U.S. 399 (2006), addressing a Dallas-Fort Worth area congressional district, CD 24, the Court carefully explained that, while Section 2 might not require their creation, coalition districts are entitled to a higher degree of protection under the Voting Rights Act  *Id*. at 446-47; *see also Bartlett*, 551 U.S. at 20 (contrasting Section 2 requirements with "the *more stringent* § 5") (emphasis added).  By extension, the Constitution, the underpinning of the Voting Rights Act, must also forbid the intentional destruction of crossover districts.

The three-judge court in D.C., which considered the latest challenge to Texas's statewide redistricting plan, understood these carefully drawn distinctions. It explained that Texas, like Defendants here, had "ignored [districts] in which coalitions of minority voters and coalitions of minority and White voters formed to support the minority-preferred candidate." *Texas v. United States*, Cause No. 1:11-cv-01303-RMC-TBG-BAH, Mem. Op. (ECF No. 115), Dec. 22, 2011 ("D.C.

15

Summary Judgment Op."), at 34 (case later dismissed in light of *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013)).  But, the Court said, "Section 5 *requires* such consideration." *Id*. (emphasis added). The court explained: "[F]reedom from an obligation to *create* a crossover district under Section 2 does not equate to freedom to *ignore* the reality of an existing crossover district in which minority citizens are able to elect their chosen candidates under Section 5."  D.C. Summary Judgment Op. at 36.  From this, the Court concluded that, since coalition and crossover districts provide minority voters the ability to elect their preferred candidates, "they *must be recognized* as ability districts in a Section 5 analysis." *Id*. (emphasis added).

The Fifth Circuit's *en banc* decision in *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993), is also legal precedent that warrants rejection of Galveston County's intentional efforts to dismantle the effective minority coalition districts. In the context of analyzing general election data to determine cohesion among different minority voting groups, the Court of Appeals expressly recognized the validity of the concept of coalition districts under the Act: "If blacks and Hispanics vote cohesively, they are legally a single minority group" for Voting Rights Act purposes. *Id.* at 864.  This principle had been governing law in the Fifth Circuit for more than two decades at the time the County took up this redistricting, a

redistricting process that was not even required by law.  Yet, the County actively worked to eliminate such districts in its redistricting handiwork, dismantling them at the first opportunity, in the face of a previous Department of Justice objection and immediately following the decision in *Shelby County*.  When combined with the already-discussed admonition in *Bartlett v. Strickland* that the purposeful destruction of crossover districts is constitutionally suspect, the county's efforts to justify its destruction of effective districts for minority voters in its enacted map is legally untenable.

As already discussed, current Districts 1 and 5 are crossover districts under the *Bartlett* standard. The County has not seriously contested that these districts performed for minority voters, offering no persuasive evidence against the performance of these two districts for minority preferred candidates.  It is no defense to this unconstitutional act for the County to argue that Section 2 does not require it to create a crossover district. That is a non-sequitur. The issue here is not what Section 2 does or does not require; it is what the Constitution prohibits.  And what it prohibits is intentional discrimination against minority voters, which is what we have here.

17

### III.   __INTENT FACTORS__

Before turning to the intent factors, it should be noted that Galveston County admits it intentionally dismantled Districts 1 and 5, and it did so because of the erroneous belief that such districts were not protected by law.

What is more, even if the County was not aware of the above-cited authorities, which recognize the protection of such districts, the previous DOJ objection gave Galveston County plenty of notice its actions would harm minority voting strength.  Despite this notification, the County went forward anyway.  That objection reads as a roadmap of intent factors this Court should follow in assessing the evidence in this case.  The DOJ stated, "there is sufficient credible evidence that precludes the county from establishing, as it must under Section 5, that the reduction of the number of justice of the peace/constable districts as well as the redistricting plan to elect those officials will not have a retrogressive effect, *and were not motivated by a discriminatory intent.*" Plt. Ex. 44, at 4 (emphasis added). Rather than heed the warning given it by the DOJ, the County—when first presented the opportunity to ignore the DOJ objection because of the *Shelby County* decision—immediately set to work reviving their previous discriminatory plan, while completely failing to address any of the issues the DOJ had raised in its objection letter.

18

The factors that formed the basis of the DOJ's objections are similarly present under these facts.  These include the County's: (1) failure to adopt redistricting principles, as was done in past cycles (a substantive and procedural departure from the norm), *id.* at 2; (2) deliberate exclusion from meaningful involvement for those officeholders elected from minority precincts, *id.*; (3) relocation of the largely Anglo-populated Bolivar Peninsula into the sole minority ability-to-elect district, *id.*; (4) changes to the precinct boundaries when changes were unnecessary, *id.* at 3; (5) reduction of ability-to-elect districts according to the DOJ, from three to one, *id.* at 4; (6) reduction in the number of minority districts (a discriminatory impact and an important starting point in assessing discriminatory intent) as soon as possible after the decree in *Hoskins v. Hannah,* 8 F.3d 21 (5th Cir. 1993) expired and now after *Shelby County* lifted the County's obligation to abide by the DOJ's Section 5 objection, *id.*; and (7) consolidation of the minority precincts, while leaving the Anglo districts largely intact.  These actions by the County to (a) ignore the clear authority that prohibits the dismantling of effective minority districts, and (b) ignore the DOJ's objection are telling and strongly suggest the presence of intentional discrimination.  The fact the County would retain an expert and then deliberately choose not to inform its expert witness of the

DOJ Section 5 objection in a case where that issue is squarely before this Court is also highly relevant in assessing the County's racially discriminatory purpose.

As suggested above, the County also fares no better when considering the evidence under the *Arlington Heights* factors. Factors relevant to determining whether there is evidence of a discriminatory purpose include: (i) an act's discriminatory impact, (ii) the historical background of the decision, (iii) the sequence of events leading up to the challenged decision, (iv) any procedural or substantive departures from the normal decision-making process, and (v) the contemporaneous viewpoints expressed by the decision makers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). These factors are illustrative, not exhaustive. Additionally, other factors relevant to the Court's determination of discriminatory intent include bloc voting along racial lines; low minority voter registration; the exclusion of minorities from the political process; the unresponsiveness of elected officials to the particularized needs of minorities, and minorities' depressed socio-economic status attributable to the long history of discrimination that resulted in inferior education status and depressed employment and housing conditions. *Rogers v. Lodge*, 458 U.S. 613, 622-27 (1982).

Plaintiffs offered evidence of each and every one of these factors. Indeed, the vast majority of this evidence is un-rebutted in the record. Taking the factors

in turn, discriminatory impact has been clearly proven.  First, the DOJ found that the reduction in officeholders has a discriminatory impact.  Next, the population growth in Galveston County in the last decade was driven by the Latino growth. Anglos made up only about one third of the decennial growth.  Plt. Ex. 21, at 7. The County rewarded this Latino growth by *reducing* the number of officeholders the minority community could elect and by otherwise diluting minority voting strength.  Also, each Plaintiff and numerous other residents testified concerning the harms they, and the rest of the minority community, will suffer under this plan. Each of the reasons stated in the standing section above concerning the harms suffered by Plaintiffs illustrates the discriminatory impact of the decision to reduce the offices from eight to four and the method by which the County chose to district the offices.  The fact that the minority voters suffer a diminution in the number of officeholders they can elect, in the face of minority growth, suggest Galveston County is seeking to preserve and expand Anglo voting power by its decision at issue in this case.  Such actions are patently discriminatory.

The historical background evidence is also terribly damaging to the County's defense.  The evidence demonstrates that in the last several decades, Galveston County has had approximately six Section 5 objections—a nearly unprecedented number of objections for a jurisdiction of its size.  Galveston County, since the

21

1990s, has had federal election observers assigned to it approximately seven times. Plt. Exs. 29-34. In 2007, Galveston County was sued for violating the Help America Vote Act, which resulted in a Consent Decree that required the County to prepare election forms in Spanish. Plt. Ex. 35. The Galveston Independent School district was successfully sued for desegregation, and it was not found unitary until 2009—more than five decades after *Brown v. Board of Education*, 347 U.S. 483 (1954). In 1996, the City of Galveston Housing Authority was successfully sued for its failure to desegregate its public housing. Plt. Ex. 28. The recently defeated City of Galveston Mayor testified at length regarding the racially discriminatory undertones of the debate and litigation surrounding the decision to rebuild low income housing after Hurricane Ike. Indeed, there are residents of the County who are still actively opposing reconstruction of public housing in Ike's aftermath in order to prevent minority citizens from returning to the County. The fact that a County like Galveston has been engaging in blatant, purposeful discrimination for so long and in so many areas strongly suggests that its challenged decision in this case is inspired by a racially discriminatory intent.

The specific historical events that led up to the decision respecting the Justice of the Peace and Constable districts are also instructive. First, the County operated well more than four of these districts for the last several decades, even

22

though the population was substantially less, and there was no apparent or urgent need to bring about a reduction.  Additionally, this federal court, in 1992, ordered the creation of two minority opportunity districts.  The County sought to undo that progress the first chance it could after the Court order expired.  This timing is also highly probative of racially discriminatory intent.  Moreover, when the County did take public comment on the plan in 2011, it was told by one witness after another that including Bolivar in the minority precinct did not make sense.  And yet, despite overwhelming multi-racial opposition to this plan, and despite the DOJ's concerns about combining Bolivar into the minority district, the County stuck to the same strategy in the latest adopted map without non-racial justification.

All the history surrounding the 2011 redistricting and the subsequent DOJ objection and litigation was not enough to dissuade the County that its methods and goals were inconsistent with the law.  Despite that substantial history, the County went to work—a mere two days after the *Shelby County* decision was handed down—to reduce the number of offices.  Commissioner Holmes testified that Commissioner Clark had told him roughly within two days of *Shelby County* that the Anglo majority was moving ahead with its plan to reduce these offices.

The sequence of events that led up to the County's decision strongly supports the finding of intentional racial discrimination.  First, the historical events

23

that led up to the County's decision, and which are described above, strongly suggest an invidious purpose.  Second, this map was adopted at the very same meeting that it was released to the public.  Despite Commissioner Clark having told Commissioner Holmes sometime in late June 2013 that the plan was moving forward, public notice of the meeting to adopt the plan was made exactly three days before the vote, the minimum amount of notice required by law.   The minority community and officeholders were intentionally excluded from the plans' development.  Furthermore, other than the public comment accepted at the time of the vote (which could have only a limited benefit, given that the map was only released that same day), the County took no further public comments on the plan, and it did not hold any community meetings. This is at variance from the County's prior redistricting, which took place in public. The County has made no effort to explain these clandestine events, nor could it.   The real reason for these machinations was to hide its actions from the public in general and the minority community in particular.  In essence, the County's secretive deliberations were intended to disguise the discriminatory intent behind the plan.

The events described above also amount to procedural and substantive departures from the norm.  It is also striking that the DOJ informed the County in 2012 that the DOJ was concerned by the County's lack of adopted redistricting

principles, and was further concerned that the failure to adopt them "was a deliberate decision by the county to avoid being held to a procedural or substantive standard of conduct with regard to the manner in which it complied with the constitutional and statutory requirements of redistricting." Plt. Ex. 44, at 2. How hard was it for the County to undertake this important step in 2013? The answer seems obvious: not hard if it intended to act in a nondiscriminatory manner.

As for contemporaneous statements by decision makers, this evidence also supports an intentional discrimination finding. Plaintiffs have proven the County's stated reason for this plan, *i.e.*, that it will save money, is a pretext for discrimination. First, in 2011, when the County first tried to reduce the number of offices to five, there was no analysis of the cost savings other than a "back of the napkin" analysis performed by Judge Henry. So, for the County to claim now the reason they went to work days after *Shelby County* to enact this plan, despite all the opposition, in order to save money, lacks credibility. Moreover, the analysis of cost savings performed after the County had already decided to reduce the number of offices, at any legal cost, involved no reasonable accounting methods. None of the County career staff was included in the decision-making process. Many of the actual officeholders were deliberately excluded. Indeed, the analysis was prepared by the newest member of Commissioners Court, who had only taken office in

25

2013.   The County also provided no objective evidence as to why choose four offices rather than five or six.[4]  Proposing the need to reduce offices, due allegedly to a lack of work, despite the County population growth, only explains so much. Why go from eight to four?  Why was going eight to five acceptable in 2011?  The County has given no non-racial motivation for its artificial selection of four offices.

Lastly on this point, and perhaps most importantly, the "case count" analysis with which the County allegedly locked its consultant in a closet (and shut out from any other influences), was meaningless since the data it produced was not available at a granular level.  The only case count data available was per district, under the old lines.  A mapper moving around voting precincts would have no basis to include one or another using simply district-wide case count.  Instead what the mapper had available was data on population and race.  A close review of the adopted districts reveals that the number of precinct splits, and the methodology used to consolidate the districts, at least in the particulars, cannot be explained or

---

[4] The County's testimony that it offered to accept any five- or six-district plan the Plaintiffs could draw is (1) not true and (2) terribly damaging to the County's defense of this case.  If the County officials believed five or six districts were acceptable, and it similarly knew the effect of drawing four districts on the minority population, then the decision to jam together four districts tends to prove discriminatory intent.  In any event, the testimony that the County would accept a five- or six-district map is untrue.  Plaintiffs have, even since trial, offered to draw or negotiate over such a plan, and they have been expressly told by the County that it will only consider a four -map. The lack of veracity with the Court of the Defendants' willingness to use a five- or six-district plan, along with the other fanciful explanations County witnesses offered, similarly weighs in favor of a finding of discriminatory intent. It cannot be true that the County, after all the 2011-2012 history, after *Shelby County,* simply locked its expert in a proverbial closet, quarantined him from the DOJ objection, and simply accepted blindly whatever product with which the expert came up.  But, even if the Court accepts this testimony as true, the decision itself to go to four districts instead of another number, predetermined the racially discriminatory effect of the plan the expert would draw.

justified based on case counts.  There must have been another reason these specific decisions were made.  The County has offered no evidence explaining each of the decisions to split this precinct and not that other one.  The County offered no evidence why one district was consolidated with another in the manner in which it was consolidated.

As to the other factors laid out in *Rogers v. Lodge*, Plaintiffs have proven them as well.  First, bloc voting along racial lines has been established.  Indeed, Plaintiffs are not aware of any case in Texas that did not find voting patterns characterized by racial polarization.  Plus, both parties' experts agree there is racial polarization.  If there is a disagreement, it is only about the degree.  However, the testimony and study by Dr. Barreto and Dr. Pedraza clearly establishes racial bloc voting.  Dr. Barreto testified it was some of the most polarized voting he has seen in all his studies around the country.

On the issue of low minority voter registration, Plaintiffs concede that African-American registration is about at parity with Anglos.  That said, the evidence in the record is that there is still a substantial difference in registration between Latinos and Anglos in the County.

On exclusion from the political process, one Plaintiff after another testified how on this issue, and others, they have been excluded from the County's process.

27

Indeed, the so-called case count analysis only included the interviews of the Anglo elected officers.  Commissioner Dennard disputes this testimony, but the Court should find that Plaintiffs' testimony is credible and persuasive.  This evidence offered by Plaintiffs shows how the County is unresponsive to the needs and interests of minority voters.

The Plaintiffs also presented evidence, including their own testimony and the testimony of other citizen witnesses, that there is a lack of attention to issues in the minority communities.  For example, after Hurricane Ike, there has been less robust rebuilding in the minority populated areas.  Many of the members of the current Commissioners Court could not identify, even in general terms, the size of the minority populations in their districts.  These same Anglo officers could not even name an area in their district that is made up of predominately minority citizens.  *See e.g.,* Dennard deposition (Jan. 7, 2014), p. 11, 5-19.  This shocking testimony either shows a complete lack of honesty or intentional indifference to minority citizens.  Whatever the root, this testimony demonstrates these elected officials are, at a minimum, not responsive to the needs of their minority constituents (who now, under the newly-drawn plan, mostly reside in districts represented by Anglo-preferred candidates).

Finally, the depressed socio-economic status of minority citizens is attributable to a history of education, employment and housing discrimination. Plaintiffs' expert witness George Korbel testified that Latinos and African-Americans in Galveston County lag behind Anglo citizens in (1) literacy, Plt. Ex. 21, at 1; (2) college education, Plt. Ex. 21, at 2-3; (3) household income, Plt. Ex. 21, at 4-5; and poverty, Plt. Ex. 21, at 6. The only rebuttal the County offered to this evidence was the vague assertion, without evidence, that the depressed socio-economic status of minority citizens is attributable to substantial unlawful immigration. Mr. Korbel testified persuasively in opposition to this assertion and no affirmative evidence was offered. Nevertheless, the demonstration that the architects of the challenged plan believe the *real problem* in Galveston County is illegal immigration, is consistent with Plaintiffs' case that the County and its representatives are completely insensitive to the needs and particularized interests of minority voters.

## IV.   PROPORTIONALITY

In 1992, the Supreme Court singled out proportionality as an important factor to consider when analyzing the effect of a redistricting plan; yet the Court declined to particularly describe the limits to such an analysis's probative value. *See Johnson v. De Grandy*, 512 U.S. 997, 1017 n.14 (1994). For one thing, the

29

Supreme Court has yet to rule as to whether proportionality is decided by looking at the population as a whole or by looking at only the citizen voting age population.

With respect to Galveston, at the time the DOJ objected to the County's proposed decision, the combined Latino and African-American CVAP is 29.1%. Plt. Ex. 44, at 1.[5] The combined Latino and African-American CVAP, according to Dr. Barreto and Dr. Pedraza, was 30.3%.[6] Plt. Ex. 1, at 8 tbl.4. The last census demonstrated the combined Latino and African-American population in 2012 was 36.4%. Thus, even if we were to assume that proportionality applies outside the Section 2 context, and with respect to districts where no population deviation standard must be met, Galveston County's new plan (whether utilizing CVAP or total population) does not provide for proportionality. This is especially true when there was no requirement that the County only have four districts; it had operated for decades with many more and, since 1992, had operated with nine officeholders and eight districts. Thus, the County could have provided for proportionality but it chose not to.

If the Section 2 proportionality consideration has some application here, the more applicable authority is *LULAC v. Perry*, 548 U.S. 399, 434 (2006). In

---

[5] DOJ utilized the 2006-2011 ACS data. *Id.*
[6] Dr. Barreto and Dr. Pedraza utilized the 2007-2012 ACS, which they testified would be closer to the real 2010 number given that the survey is a weighted average over five years.

*LULAC*, unlike in *DeGrandy*, the plaintiffs alleged "injury to African American and Hispanic voters throughout the State" *Id.* The Supreme Court concluded that in such cases, proportionality should be considered statewide.  However, the Court cautioned that considering proportionality statewide does not mean a State can satisfy Section 2 simply by showing rough proportionality without regard to where majority-minority districts are located and the manner in which they are drawn. The question of whether a minority's voting power has been diluted still requires an "intensely local appraisal," *id.* (quoting *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)), of challenged districts because "the right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members,'" *id.* (quoting *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)).   The *LULAC* Court re-emphasized that because the Section 2 right protecting against vote dilution is an individual right, "a State may not trade off the rights of some members of a racial group against the rights of other members of that group."  *Id.* at 438.

The County asserts that even if discriminatory intent is proven, there is no remedy the Court could adopt to repair the harm caused.  According to the County, approximately one quarter of the citizen voting age population is minority, and under the challenged plan, minorities will have one quarter of the districts.  The County is wrong for several reasons.  First, as shown above, the County's proposed

plan is not proportional.  Second, even if it were, this argument ignores the holding in *LULAC* that a jurisdiction "may not trade off the rights of some members of a racial group against the rights of other members of that group."  Indeed, as demonstrated above, the County has done harm to a majority of the minority residents in the County by assigning more than half of them to Anglo-dominated districts.  Finally, proportionality does not automatically protect a jurisdiction from liability under Section 2.  As Justice O'Connor stated in a separate opinion, proportionality "is always relevant evidence in determining vote dilution, but it is never itself dispositive."  *Id.* at 1025 (O'Connor, J., concurring).  This holding is consistent with other jurisprudence concerning racial discrimination.  The Supreme Court has expressly rejected the proportionality "bottom-line theory of defense" when employers tried to invoke it to defend racially discriminatory employment practices.  *See Connecticut v. Teal,* 457 U.S. 440 (1982).  Plainly stated, the proportionality inquiry does not allow a jurisdiction to remedy vote-dilution injuries suffered by minorities in one part of the jurisdiction simply by creating a majority-minority district elsewhere in the jurisdiction.

The fact that Galveston County substantially underpopulated the single minority district it did create also undermines the proportionality defense.  What Galveston County is trying to do is to convince the Court not to undertake the

"intensely local appraisal" of the challenged districts and the process that led to their creation because that evidence is overwhelmingly damaging to the County's position. *Id.* at 434 (quoting *Gingles*, 478 U.S. at 79).

So what does this mean the Court can do by way of a remedy?  The District Court has broad power to remedy past wrongs that result from discriminatory intent.  *See Swann v. Bd. of Educ.*, 402 U.S. 1, 15 (1971).  Typically, the Court should first give the jurisdiction a chance to remedy the constitutional defect.  *See e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979). Thus, because the process used to adopt the plan was intentionally discriminatory and racially excusive, as a threshold remedy, the Court should order the County to undertake anew the process of drawing a map, if it remains the County's desire to alter the current system.  Because intent has been proven in this case, the Court should order the County to seek and obtain from the DOJ, or this Court, preclearance of any new map it adopts pursuant to Section 3c of the Voting Rights Act.  In its remedial order, the Court should require the County to conduct a new process under normal, racially inclusive parameters.  In doing so, the Court would be imposing a remedy that is commensurate with the nature and extent of the racially exclusionary process that characterized its 2013 decision.  *See Swann,* 402 U.S. 16. The County should adopt traditional non-discriminatory redistricting criteria, hold

public meetings in minority neighborhoods,[7] offer proposed maps well in advance of their consideration by the Commissioner Court, give serious consideration to the objections of the DOJ and those stated in the Court's opinion, and consider the impact of such a plan on the destruction or impairment of the existing ability of minority voters to elect their preferred candidates in the proposed districts.  During the new process, all events and conversation regarding redistricting should be held in open meetings.  Any contact with the map drawer must be done in open.  Lastly, should the County receive legal advice on the contours of a map, such meetings should be recorded and provided to the Court *in camera*.

Until the County meets this Court's remedial order, the County should be enjoined from making changes to the benchmark map.  Each of these remedies stops short of directing the County to draw or utilize a certain number of districts under a certain plan.  Nevertheless, these proposed remedial provisions would go to the heart of the proven discriminatory conduct by Defendants and would repair the harm created by their unconstitutional conduct.       Finally, of one last note; Galveston County, throughout the defense and trial of this case, has asserted that the Court must call out by name those individuals who were driven by racial intent. This is simply not true.  The Court need only determine that the governmental action was discriminatory.  The purpose of the *Arlington Heights* and *Rogers* tests

---

[7] Plaintiffs can assist in pointing County officials to these localities if they truly have no idea where they are located.

are to allow the Court to determine, from circumstantial evidence, any discriminatory intent on behalf of the governmental body. *See Rogers v. Lodge*, 458 U.S. 613, 622-27 (1982).  Indeed, the Supreme Court itself has, on numerous occasions, found, without naming names, that a government action was discriminatory. *See e.g.*, *White v. Regester*, 412 U.S. 755 (1973); *LULAC v. Perry*, 548 U.S. 399 (2006).  *See also, Hunter v. Underwood,* 471 U.S. 222 (1985) (declaring portion of the 1901 Alabama constitution purposely racially discriminatory).  The County's efforts to raise Plaintiffs' burden of proof, thereby requiring them to prove exactly who held the ill motives in their hearts, should be rejected by the Court because it is patently inconsistent with case law and Supreme Court precedent.

One final note, the Court may recall that counsel for the County argued that all past evidence of discrimination is no longer relevant as a result of *Shelby County,* taking a portion of that opinion relating to the inapplicability of the coverage formula set forth in Section 4 of the Voting Rights Act out of context. *Shelby County* does not stand for the proposition that past events are ignored.  The basis behind *Shelby County* was to disengage Section 5 of the Voting Rights Act (perhaps temporarily) to allow Congress to reconsider the coverage formula.  The

Court specifically stated Section 2 of the Voting Rights Act still existed to allow for redress of injuries caused by discrimination.

The County's disingenuous argument in this regard capsulizes the error in the County's analysis of the case law that governs this circumstance. County witness after county witness stated unequivocally that they relied solely on their counsel and experts hired by their counsel to create the map in question and to implement the process by which the map was adopted. The only direct input provided by the lawmakers was their directive to draw four districts.

By taking this strategic direction, the County clearly disregarded the normal legislative process that had been followed in the past. By making the argument that such history was no longer relevant in light of their strained interpretation of the *Shelby County* decision, the County clearly bolsters the Plaintiffs' claim that this plan was adopted with discriminatory intent as it is defined by *Arlington Heights* and *Rogers*. By further making the contention that this Court can provide no remedy, even if it finds that discriminatory intent was proven, the County invites this Court to order them to maintain the benchmark map until they show the ability to adopt a plan without engaging in conduct that clearly establishes discriminatory intent.

## V.   <u>CONCLUSION</u>

Plaintiffs offer the argument and authority above in response to the Court's order requiring briefing.  Plaintiffs pray this Court grant them the relief requested.

Dated this the 31st day of January, 2014.

Respectfully Submitted,

_/s/  Chad W. Dunn_
Chad W. Dunn
Texas Bar No. 24036507
K. Scott Brazil
BRAZIL & DUNN
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
chad@brazilanddunn.com


Neil G. Baron
Federal ID: 10141
State Bar No. 01797080
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539
Telephone (281) 534-2748
Facsimile (281) 534-4309
neil@ngbaronlaw.com

_Attorneys for Plaintiffs_

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2014, I served a true and correct copy of

to the following counsel of record via the Court ECF delivery:

Robert Boemer                          Joseph M. Nixon
Barry C. Willey                        1300 Post Oak Blvd.
722 Moody, 5th Floor                   Suite 2500
Galveston, Texas 77550                 Houston, Texas 77056
*Counsel for Defendants*               *Counsel for Defendants*

James E. "Trey" Trainor, III
Dalton L. Oldhan
Beirne, Maynard & Parsons, L.L.P.
401 W. 15th Street, Suite 845
Austin, Texas 78701
*Counsel for Defendants*

*/s/  Chad W. Dunn*
Chad W. Dunn