**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| TERRY PETTEWAY, DERRICK ROSE, MICHAEL MONTEZ, SONNY JAMES, and PENNY POPE, | § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 3:13-CV-00308 |
| v. | § § | |
| GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § | |
| *Defendants*. | § § | |

### PLAINTIFFS' FIRST SUPPLEMENTAL COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs file this First Supplemental Complaint setting forth events that occurred after the filing of their Original Complaint on August 26, 2013 and pleading additional claims based on those events. This First Supplemental Complaint is filed in addition to, not in replacement of, Plaintiffs' Original Complaint. Plaintiffs allege as follows:

### SUPPLEMENTAL FACTUAL ALLEGATIONS

#### *The 2020 Census*

1.      The 2020 Census revealed that the total population of Galveston County increased by more than 20 percent, from 291,309 residents during the 2010 Census to 350,682 residents during the 2020 Census.

2.      Between the 2010 and 2020 Census, the Black voting age population ("VAP") in the County increased by more than 15 percent, from 29,545 in 2010 to 35,043 in 2020.

3. The Hispanic or Latino voting age population increased by more than 29% from 42,649 in 2010 to 60,159 in 2020.

4. The Black and Hispanic voting age population increased from a combined 33.2% to 35.6% of the total voting age population between 2010 and 2020.

5. As a result of this substantial growth in Galveston County's minority population, the Anglo share of the County's voting age population fell from 62.8% in 2010 to 58.0% in 2020.

6. The U.S. Census Bureau released the results on the 2020 Census on August 25, 2021.

7. On November 1, 2021, the Elections Division of the Texas Secretary of State issued an advisory directing all county officials in the State to submit any proposed changes to commissioners court or justice of the peace maps by November 13, 2021. *See* TEX. SEC'Y OF STATE, Election Advisory No. 2021-14 (Nov. 1, 2021), available at https://www.sos.texas.gov/elections/laws/advisory2021-14.shtml.

***The 2021 Galveston County Redistricting Process Featured Intentional Racial Discrimination***

8. Despite these population changes, the Galveston County Commission ("the County") made no changes to the Justice of the Peace ("JP") precincts that were enacted in 2013.

9. At the same time, the County made radical changes to the Commissioners precincts for the purpose of denying Black and Latino voters the opportunity to elect their preferred candidate.

10. The benchmark plan contains one precinct, Precinct 3, in which Black and Latino voters form a majority of the voting age population.

11. The VAP of benchmark Precinct 3 is 30% Black and 31% Latino.

12. The map below shows the benchmark Commissioners precincts with blue shading identifying the voting tabulation districts ("VTDs") with substantial minority populations.

**BENCHMARK COMMISSIONERS COURT PLAN**



13. Precinct 3 in the benchmark plan, with its majority-minority voting age population, has long performed to provide Black and Latino voters the opportunity to elect their preferred candidate.

14. Since 1999, Precinct 3 has been represented by Stephen D. Holmes, a Black man, and the candidate of choice of Black and Latino voters in Precinct 3.

15. In 2011, the County adopted the benchmark plan as result of negotiations with the Department of Justice, after the Department of Justice objected to the County's proposed map that would have diminished the voting strength of Black and Hispanic voters in Precinct 3.

16. The 2020 Census revealed that the benchmark plan was malapportioned but shifting just one (1) VTD in the plan would have balanced the population to within a legally permissible deviation.

17. Yet the 2021 plan radically alters the Commissioner precincts, dismantling Precinct 3 and cracking apart its Black and Latino voters across all four precincts, as shown below.

**2021 ENACTED COMMISSIONERS COURT PLAN**



18. By spreading Galveston County's Black and Latino population across all four Commissioner precincts, the County has ensured that these voters will have no opportunity to elect their preferred candidate in any precinct.

19. This discriminatory cracking of Black and Latino voters was not an accident.

20. The decision to crack apart the County's Black and Latino voters was the product of intentional racial discrimination.

21.     The County adopted no redistricting criteria to guide the drawing of precinct lines.

22.     In 2011, the Department of Justice concluded that lack of adopted criteria—a departure from past practice—evidenced a racially discriminatory motive of attempting to hide the true purpose of the plan.

23.     Around November 9, 2021, the County released two proposed maps to redraw the district lines for the Commissioners Court.

24.     The Commissioners employed the same attorneys to draw the proposed maps as those who drew the maps to which the DOJ denied preclearance in 2011.

25.     The first proposal, Map 1, largely maintained the same lines as the map implemented in 2011 but added the largely Anglo Bolivar Peninsula to Commissioner Precinct 3.

26.     Under this proposal, Precinct 3 would have retained its status as a majority-minority voting age population precinct, but would have been a smaller majority than the benchmark plan.

27.     Under the first proposal, Black and Latino voters would have constituted 58% of the precinct's voting age population.

28.     The second proposal or Map 2—the one ultimately adopted and shown above—dismantled Precinct 3 as a preforming majority-minority precinct.

29.     On November 12, 2021, the Commissioners Court held a public hearing regarding the two proposed plans.

30.     The Commissioners Court heard public testimony on the adoption of Map 2 at the November 12, 2021, hearing.

31.     Many residents expressed concern that the map would eliminate minority communities' voting strength in the County.

32.	Indeed, residents spoke at length about the racially discriminatory results the adoption of the second proposed plan would cause.

33.	Residents alleged that Map 2 was drawn to ensure the election defeat of Precinct 3 Commissioner Stephen Holmes, who residents described as the only commissioner who represented the interests of the minority community in the County.

34.	The 2021 Galveston County redistricting process featured significant departures from procedural norms.

35.	In the past, the Galveston County Commissioners Court held multiple public hearings at different sites across the county in order to obtain feedback from the public in time for it to be considered prior to the deadline to adopt a plan.

36.	Those meetings were held in the evening to permit more members of the public to attend without missing work

37.	Yet the November 12 hearing was the only public meeting regarding the Commissioners Court map proposals and was held in the middle of the afternoon.

38.	When residents asked for additional public meetings during the hearing, Judge Henry stated that additional meetings were not possible because the deadline for counties to submit county maps to the Secretary of State was November 13, 2021.

39.	Judge Henry did not explain why earlier public meetings were not scheduled by the Commissioners Court, nor why the only public meeting for the proposed maps was held the day before the deadline to submit the maps to the Secretary of State.

40.	The meeting was held in an annex building in League City, rather than the normal Commissioners Court room in Galveston.

41.     The building was surrounded by construction sites, and the hearing was held in a room less than half the size of the normal meeting room in Galveston.

42.     No microphones were provided for the public to provide comment, and there was no overflow room.

43.     Because of the absence of microphones, the public had difficulty hearing the County Judge and the Commissioners.

44.     At the beginning of the hearing, when members of the public (many of whom were minorities) alerted County Judge Henry that he couldn't be heard, he said "I'm going to speak at this tone that's all I can do I'm not going to scream I don't have a microphone."

45.     After the public grumbled at this response, Judge Henry raised his voice, yelling that "I will clear you out if you make noise, I will clear you out of here."

46.     He added, pointing to law enforcement, "I've got constables here!"

47.     The public, crammed into the small room and flowing out doors on both sides of the room and lining the hallways (in the midst of a pandemic), made clear to the Commissioners Court that the proposed plan was discriminatory, including with signs to make the point clear, as shown below (on the left is the constable Judge Henry threatened to have remove the members of the public if they "ma[d]e noise").



48.     Commissioner Stephen Holmes was not involved in the process for developing the proposed maps.

49.     At the November 12 hearing, Commissioner Holmes stated that the proposed maps were drawn without his input, and that he only met with the County's lawyer on a single occasion.

50.     Commissioner Holmes alleged that no timeline for redistricting nor opportunities for public input before presenting the maps were proposed by the other members of the Commissioners Court.

51.     Commissioner Holmes alleged that he did not know who proposed to publicize the final proposed maps on the County website.

52.     In 2011, DOJ declined preclearance citing in part the exclusion of Commissioner Holmes from the redistricting process.

53.     During the November 12 hearing, Commissioner Holmes provided the other members of the Commissioners Court a report showing the racially polarized voting in Galveston County.

54.     At the November 12 hearing, Commissioner Holmes presented two additional proposed maps which would have maintained Precinct 3 as an opportunity district.

55.     No vote was held on those proposed maps.

56.     The Commissioners Court did not release the proposed maps for the 2021 redistricting cycle to the public until shortly before the November 12 hearing.

57.     The Commissioners Court voted to adopt Map 2 at the November 12 2021, hearing.

58.     The Commissioners Court voted 3-1 in favor of the map.

59.     Commissioner Holmes was the only commissioner to vote against the map, and one commissioner was absent from the vote.

60.     Under the map adopted in 2011, Precinct 3 was comprised of 30 percent Black voters and 31 percent Hispanic voting age population.

61.     Under the new plan adopted by Defendants, Precinct 3 will be 8 percent Black voters and 23 Hispanic voting age population.

62.     No other Commissioner precinct is majority-minority.

63.     The new map dilutes the voting strength of Black and Hispanic voters in the County by moving Black and Hispanic voters into predominately Anglo districts, diminishing any chance for Black and Hispanic voters to elect their candidate of choice for Commissioners Court.

| Voting Age Population for Adopted Commissioners Court Map (Map 2) | | | | |
| Commissioner Precinct | Anglo VAP | Total Minority VAP | Hispanic VAP | Black VAP |
| --- | --- | --- | --- | --- |
| 1 | 59% | 41% | 25% | 10% |
| 2 | 58% | 42% | 23% | 14% |
| 3 | 61% | 39% | 23% | 8% |
| 4 | 55% | 45% | 19% | 20% |

64.     The County approved this map despite their knowledge that alternative map proposals would maintain Commissioner Precinct 3 as a majority-minority district.

### *Racial Predominance in the Adoption of Commissioner Precinct Lines*

65.     The predominant purpose in drawing the district lines was race.

66.     The County's redistricting scheme was controlled and dominated by the County's goal to crack apart Black and Latino voters and ensure that each precinct would have an Anglo majority.

67.     This is evidenced by attempting to pass such a plan in 2011, being prohibited from doing so do to concerns of racial discrimination in districting, and attempting to pass a substantially similar plan ten years later in 2021.

68.     The County has no compelling or sufficient justification for its predominant focus on cracking apart the minority community and ensuring an Anglo majority in each precinct.

69.     The County did not provide any analysis on their map to explain their districting choices.

70.     Racial considerations subordinate traditional redistricting principles in the enacted Commissioners Court plan.

71.     Traditional compelling governmental interests, such as compliance with the Voting Rights Act and United States Constitution support the drawing of a majority-minority VAP district.

72.     The County's choice of Map 2 and implementing a redistricting scheme that is substantially similar to one that DOJ had denied clearance to under Section 5 of the VRA cannot be rationally understood as anything other than an effort to separate voters into different districts based on race.

*VRA Section 2 Factual Allegations*

73.     Alternative plans can be drawn in which Black and Latino voters constitute a geographically compact majority of a single member Commissioners Court precinct.

74.     Black and Hispanic voters in Galveston County are politically cohesive. Statistical analysis and election results show that Black and Hispanic voters in Galveston County overwhelmingly support Democratic candidates for office while Anglo voters in Galveston County overwhelmingly support Republican candidates.

75.     Anglo voters vote sufficiently as a bloc to usually defeat the candidate of choice of Black and Latino voters in the absence of a VRA-compliant district.

76.     For example, reconstituted election results show that the candidates of choice of Black and Latino voters consistently lose all four precincts adopted in the 2021 plan for Commissioners Court.

77.     Moreover, Black and Latino voters are unable to elect their preferred candidates to other county-wide offices.

78.     The totality of circumstances illustrate that Black and Latino voters have less opportunity than other voters to participate in the electoral process in Galveston County and to elect representatives of their choice as Commissioners. *See* 52 U.S.C. § 10301(b).

79.     Galveston County has a long and well-documented history of official discrimination against Black and Hispanic residents.

80.     Galveston County was formerly subject to preclearance by the Department of Justice under Section 5 of the Voting Rights Act.

81.     As recently as 2011, the Department of Justice ("DOJ") objected to a plan for Commissioners Court which would have resulted in diluting the voting strength of the Black and

Hispanic population in Commissioner Precinct 3 by moving the largely Anglo Bolivar peninsula into the precinct.

82.     Map 1 is materially the same plan that was objected to in 2011 by the Department of Justice.

83.     In objecting to the Commissioners Court plan in 2011, which is materially the same plan adopted in 2021, the DOJ concluded that the County had not demonstrated that the 2011 map was not adopted for racially discriminatory purpose.

84.     Galveston County also entered into a consent decree with the Department of Justice in 2007 for failure to provide Spanish language assistance to voters in violation of the Help America Vote Act.

85.     Galveston County Independent School District was under federal supervision for school desegregation from 1959 until 2009.

86.     Several recent incidents in Galveston County evidence the ongoing official discrimination experienced by Black and Hispanic residents.

87.     In August 2019, the League City Police Department referred to Black residents who allegedly committed a theft as "buffoonish" on its Facebook page.

88.     In October 2019, Galveston Police Department had to formally change its arrest policy after releasing video footage of police officers walking a Black man attached to a rope while the officers rode horseback.

89.     The aftermath of Hurricane Ike, a devastating storm that sent 110 mile-per-hour winds and 12-to-15-foot storm surges across Galveston Island and the Bolivar Peninsula, underscored racial tensions in Galveston County.

90.     Four of Galveston's six public housing developments were among the thousands of structures damaged across the city during Hurricane Ike.

91.     Instead of repairing the damaged public housing developments, Galveston demolished them, displacing the residents of all 569 units and culminating a decades-long campaign to remove public housing in the name of promoting tourism and economic revitalization.

92.     The demolition prompted a fierce, racially charged debate in Galveston about whether to rebuild the City's public housing.

93.     City council meetings held to debate the issue erupted in shouting matches between predominantly white opponents of public housing and predominantly Black proponents of rebuilding.

94.     The white opponents of rebuilding were "openly racist" in their opposition to public housing.

95.     The debate continued through the City's 2012 mayoral campaign, in which challenger Lewis Rosen unseated incumbent Joe Jaworski by running on an anti-public housing platform in an election he called a "referendum on public housing."

96.     Mayor Rosen's campaign website quoted him as saying, "My position on rebuilding public housing is very simple: Don't do it."

97.     Keeping Mayor Rosen's campaign promise, the Galveston City Council declined to approve new public housing until 2013, five years after Hurricane Ike, when the Department of Justice threatened to revoke hundreds of millions in federal disaster relief it had distributed to Galveston on the condition that over $100 million of those be spent on housing assistance.

98. The agreement authorized building 145 low-income units dispersed across mixed income developments instead of the 569 one-for-one rebuilding the City had initially promised its disproportionately minority public housing residents.

99. Despite this compromise, Mayor Rosen characterized the agreement as having been "forced down our throats."

100. By 2018, $76 million of the $103 million in housing assistance grants remained unspent, Galveston's Black population had declined by 15 percent, and only 59 of the original 544 displaced families had been relocated into newly built affordable housing.

101. A Gulf Coast Interfaith organizer summed up the effect of Galveston's refusal to rebuild public housing on its Black community: "They were all exported. It's our form of apartheid."

102. Black and Hispanic residents still suffer from the effects of discrimination in Galveston County.

103. Only 8.3 percent of white residents in Galveston County live below the poverty level, but 19.8 and 19 percent of Black and Hispanic residents live below the poverty level, respectively.

104. Black and Hispanic residents have a lower high school graduation rate and lower college graduation rate than white residents in Galveston County.

105. Campaigns in Galveston County have featured overt and subtle racial appeals.

106. For example, in the 2020 Republican primary for Tax Assessor-Collector, challenger Jackie Peden's campaign sent a mailer attacking incumbent Cheryl Johnson saying that "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's

election!" The mailer included an image of an unnamed Latino man who was a member of the MS-13 gang and an inmate in an El Salvador prison.

107. The photo was taken from a British newspaper. The mailer is shown below:



108. Ms. Johnson, the incumbent, said "[i]t is despicable, it is vile, and it's a lie." She added that "[w]hen I looked at this, I was offended because it makes it appear that every Hispanic male or somebody with tattoos is an illegal immigrant."[1]

---

[1] John Wayne Ferguson, *Johnson: Peden ad 'racist,' 'discriminatory,' and 'a lie,'* The Daily News (Feb. 22, 2020), https://www.galvnews.com/news/free/article_1f26ee77-55ca-5723-a493-28fdd78f15c5.html.

109. In another example, during the campaign for the 2020 election for Galveston County Republican Party Chair, incumbent Yolanda Waters was revealed to have called a Black party official a "typical Nig" for requesting funds to attend an event, which she called an "unfortunate typo."

110. Waters rejected calls from the Governor and others to resign, and eventually lost her campaign for reelection as party chair.[2]

111. Black and Hispanic residents have seen little political representation in Galveston County.

112. In the last twenty years, Commissioner Stephen Holmes has been the only Black elected official elected to the Commissioners Court.

113. Upon information and belief, there has only been one Hispanic resident elected to the Commissioners Court.

114. Additionally, since the Justice of the Peace Courts were reduced to four districts, only one seat has been filled by a minority representative.

115. Upon information and belief, no Hispanic candidates have been reliably elected as JP in the last 20 years.

***Additional Allegations with Respect to Parties***

116. Plaintiff Pettaway is a resident of Galveston County who resides in a predominately Black and Hispanic voting precinct.

117. Under the prior Commissioners Court map, Mr. Pettaway resided in Commissioner Precinct 3.

_____

[2] Patrick Svitek, *Top Texas Republicans pressure a county chair to resign over racist text*, Tex. Tribune (Dec. 8, 2019), https://www.texastribune.org/2019/12/07/texas-republicans-racist-text-resign/.

118. Under Map 2, Mr. Pettaway now resides in Commissioner Precinct 2.

119. As a result of the adoption of Map 2, Mr. Pettaway will no longer have the equal opportunity to elect his candidate of choice for Commissioners Court.

120. With respect to the Justice of the Precincts Court, Mr. Pettaway continues to suffer from the ongoing vote dilution which occurred after the adoption of the map in 2011, which has only become more dilutive in light of the minority population growth in the County.

121. Plaintiff Rose is a resident of Galveston County who resides in a predominately Black and Hispanic voting precinct.

122. Under the prior Commissioners Court map, Mr. Rose resided in Commissioner Precinct 3. Under Map 2, Mr. Rose resides in Commissioner Precinct 1.

123. As a result of the adoption of Map 2, Mr. Rose will no longer have the equal opportunity to elect his candidate of choice for Commissioners Court.

124. With respect to the Justice of the Precincts Court, Mr. Rose continues to suffer from the ongoing vote dilution which occurred after the adoption of the map in 2011, which has only become more dilutive in light of the minority population growth in the County.

125. Plaintiff Montez is a resident of Galveston County who resides in a predominantly Black and Hispanic voting precinct.

126. Under the prior Commissioners Court map, Plaintiff Montez resided in Commissioner Precinct 1.

127. Under Map 2, Mr. Montez will reside in Commissioner Precinct 1.

128. As a result of the adoption of Map 2, Mr. Montez will lack the opportunity to elect his candidate of choice for Commissioner's Court.

129. With respect to the Justice of the Precincts Court, Mr. Montez continues to suffer from the ongoing vote dilution which occurred after the adoption of the map in 2011, which has only become more dilutive in light of the minority population growth in the County.

130. Plaintiff James is a resident of Galveston County who resides in a predominantly Black and Hispanic voting precinct.

131. Under the prior Commissioners Court map, Plaintiff James resided in Commissioner Precinct 4.

132. Under Map 2, Mr. James will reside in Commissioner Precinct 3.

133. As a result of the adoption of Map 2, Mr. James will not have the equal opportunity to elect his candidate of choice for Commissioners Court.

134. With respect to the Justice of the Precincts Court, Mr. James continues to suffer from the ongoing vote dilution which occurred after the adoption of the map in 2011, which has only become more dilutive in light of the minority population growth in the County.

135. Plaintiff Pope is a resident of Galveston County who resides in a predominately Black and Hispanic voting precinct.

136. Under the prior Commissioners Court map, Plaintiff Pope resided in Commissioner Precinct 3.

137. Under Map 2, Ms. Pope will remain in Commissioner Precinct 3. Because Commissioner Precinct 3 is no longer an opportunity district, Ms. Pope will no longer have the equal opportunity to elect her candidate of choice for Commissioners Court.

138. With respect to the Justice of the Precincts Court, Ms. Pope continues to suffer from the ongoing vote dilution which occurred after the adoption of the map in 2011, which has only become more dilutive in light of the minority population growth in the County.

*Supplemental Allegations with Respect to Counts 1 & 2 of Original Complaint*

139.    The discriminatory results that flow from the County's intentional discrimination in reducing the number of JP precincts in order to minimize the number precincts in which minority voters can elect their preferred candidate has worsened.

140.    As the 2020 Census shows, Galveston County's minority population has substantially grown, with its Black voting age population growing by more than 15% since 2010, and its Hispanic voting age population growing by more than 29% since 2010.

141.    In total, the County's Anglo share of voting age population has fallen from 62.8% to 58.0% since 2010.

142.    The increase in the Black and Hispanic population has magnified the discriminatory effects that result from the County's intentional discrimination in reducing the number of JP precincts in the 2013 JP plan.

## SUPPLEMENTAL CAUSES OF ACTION

*Count 4: Intentional Racial Discrimination in Violation of the Fourteenth Amendment: Commissioners Court Plan*

143.    Plaintiffs reallege the facts set forth above.

144.    The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

*Count 5: Intentional Racial Discrimination in Violation of the Fifteenth Amendment: Commissioners Court Plan*

145.    Plaintiffs reallege the facts set forth above.

146. The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

### Count 6: Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq.: Commissioners Court Plan

147. Plaintiffs reallege the facts set forth above.

148. The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

### Count 7: Racial Gerrymandering in Violation of the Fourteenth Amendment: Commissioners Court Plan

149. Plaintiffs reallege the facts set forth above.

150. Race predominated the drawing of Commissioners Court precinct lines, subordinating other redistricting criteria to race, without a compelling justification.

### Count 8: Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq.: Commissioners Court Plan

151. Plaintiffs reallege the facts set forth above.

152. The adopted Commissioners Court plan violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because under the totality of the circumstances, the Commissioners Court plan has the effect of denying Black and Hispanic voters an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

153. Galveston County's Black and Hispanic population is sufficiently large and geographically compact to allow for the creation of a single member Commissioners Court district in which minority voters would constitute a majority of the population and citizen voting age population.

154. Black and Latino voters in Galveston County are politically cohesive, with election results showing they overwhelmingly support Democratic candidates.

155. Anglo voters in Galveston County, who are the majority of the County, vote sufficiently as a bloc to usually defeat the candidates of choice of Black and Latino voters in the absence of a VRA-compliant district.

156. The totality of circumstances demonstrate that Black and Latino voters have less opportunity to participate in the political process and elect representatives of their choice.

## SUPPLEMENTAL REQUESTED RELIEF

In addition to the relief sought in Plaintiffs' original complaint, Plaintiffs request that the Court order the following supplemental relief:

a) Issue a declaratory judgment that the adopted Galveston County Commissioners Court plan unlawfully dilutes minorities' voting rights, through intentional racial discrimination in violation of Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act;

b) Issue a declaratory judgment that the adopted Galveston County Commissioners Court plan had race as the predominant consideration, with other districting criteria subordinated to race, without any sufficient justification;

c) Issue a declaratory judgment that the adopted Galveston County Commissioners Court plan violates the discriminatory results prohibition of Section 2 of the Voting Rights Act by

failing to include a district in which Black and Latino voters have an opportunity to elect their candidate of choice;

d)      Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the adopted Commissioners' Court plan. Plaintiffs have no adequate remedy at law other than the judicial relief sought herein; and unless Defendants are enjoined from using the adopted Commissioners Court plan, Plaintiffs will be irreparably injured by the continued violation of their constitutional and statutory rights;

e)      Set a reasonable deadline for the County to adopt a valid redistricting plan by the Court's deadline that does not dilute, cancel out, or minimize the voting strength of minority voters in Galveston County;

f)      If the County fails to adopt a valid redistricting plan by the Court's deadline, order a new County Commissioners redistricting plan that does not dilute, cancel out, or minimize the voting strength of Galveston County minority voters;

g)      Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

h)      Retain jurisdiction and render any further orders that the Court may find necessary to cure the violation; and

i)      Grant any and all further relief to which Plaintiffs may show themselves to be entitled.

January 18, 2022

Mark P. Gaber*
Caleb Jackson*
Valencia Richardson*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
cjackson@campaignlegal.org
vrichardson@campaignlegal.org

Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
sonni@uclavrp.org

*Motion for admission pro hac vice
forthcoming*

Respectfully submitted,

/s/ Chad W. Dunn
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Cave Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

*Counsel for Plaintiffs*